Casey, C. J.,
delivered the opinion of the court:
Some time in September, 1864, Major Henry C. Symonds, commissary of subsistence at Louisville, Kentucky, was directed by General Eaton, Commissary General of Subsistence, to inquire into the feasibility of purchasing hogs and slaughtering them on behalf of the United States, to furnish pork for the army. On the 14th and 16th days, respectively, of the same month, Symonds made his first report on the subject, accompanied with a detailed statement. On the 21st General Eaton wrote to Symonds that his letters had been received and referred to the Secretary of War, with a recommendation that Sy-monds be authorized to purchase, cure, and pack pork, bacon, See., as proposed ; and that the Secretary of War had approved of the measure. The letter added :
The details of the business are left to your discretion. As it is an experiment that may not turn out to meet your and my anticipations, it is not desirable to arrange the matter for permanence, nor for .a very heavy pack. I advise that you aim not to exceed, say, twenty thousand hpgs, until considerable progress shall demonstrate the entire ‘feasibility and advisability’ of the measure’'’
On the 13th October Major Symonds wrote to General Eaton, detailing his negotiations with the various packers, the offers that were made, and the combinations that had been formed to extort very large *434 prices from the government. He also refers to tbe fact of having commenced negotiations with the claimants in these cases. On the subject of the number of hogs to he slaughtered and contracted for, he says:
“ I can readily get 100,000 hogs in Kentucky, and hy General Bur-bridge’s order control the whole price and movement of them in Kentucky ; whereas, if I undertake only 20,000 or 30,000,1 will he easily outstripped by the pork packers, who, hy my present plan, will have hut little to do.”
On the 14th October Major Symonds again wrote to the Commissary General. The following extracts contain all that is deemed important in this letter:
“For 100,000 hogs, the difference between the best of my first offers and the present one, there is about $175,000 in favor of the United States, and 1 do not believe I can- do any better than this. I had no idea of the difficulties and complications, and as soon as these wealthy semi-loyal parties find that their occupation for this season is about gone, they will compass everything-to break it up. * * *
“ They claim that reasonable packing profits are $1 per hog, at least. My arrangement gives no promise of over 40 cents, and the capital and risk are with that. I know I am about right in my measures.”
On the 17th October Major Symonds wrote again to the Commissary General, giving a general statement of the progress he is making. He says :
“ General : I find that I have outgeneraled the packers, and they do not seem to feel that any wrong has been done to them, but attribute their misfortune to their own greed, and they seem to agree that I have done the best thing possible. So I think my fancied danger from that source is passed.”
To these letters General Eaton replies as follows:
“Office Commissary General Subsistence,
“ Washington City, October 20, 1864.
“Major : I have received your several letters of the 13th, 14th, and 17th, together with the enclosures, on the subject of pork packing. The progress you have made appears to me to be very satisfactory, considering the difficulties you have encountered.
“ Captain Elderkin has been ordered to report to you, and I have today requested that Captain Bright may be so ordered.
“The whole subject of packing pork at Louisville is placed, subject to your direction, under the advice of Colonel Kilburn. It is a novel *435 undertaking for tbe Subsistence department, but I expect from your zeal and devotion to tbe subject to realize satisfactory results.
“Very respectfully, your obedient servant,
«A. B. EATON, G. G. S.
“ Major H. 0. Symonds,
“ C. S., 77. S. A., Louisville, Kentucky.
“Note. — Do you wish any of tbe enclosed papers accompanying your letters to be returned ?
“A. B. E.”
On tbe 19th October Major Symonds wrote to General Eaton. Tbe following are extracts:
“ GENERAL: I send you a copy of a letter I wrote to General Bur-bridge, commanding district of Kentucky. So many of the country people are coming in to see me that I have not felt able to go and see him in person, but it may soon be possible. I find everything is going along most satisfactorily, but it will be necessary that I go into it so largely as to control the whole business in Kentucky, or I may yet be troubled.
“If General Burbridge concurs in my wishes — and I do not doubt he will — I will, by the 25th of November, be able to forward to the front at least 2,000 barrels pork daily, and so I do not think we need make any provision for this point beyond that date.
“ I have made contracts for killing at least 100,000 hogs, and have made arrangements for cooperage. The parties are going to work to get their houses in order, .and I think we will get at least 25,000,000 pounds meat, at not exceeding 15 cents per pound, in shipping order.”
On the 25th October Major Symonds enclosed to the Commissary General his estimate for funds, as follows :
“ General : I enclose you a special estimate for funds. I have made every estimate of cost as high as I think it can possibly 'be, and every estimate of sales as low as possible with such original cost; hence I am satisfied I give inside figures. These figures will give, say—
40,000 bbls. pork, at $33. ,11,320,000
3,000,000 hams, at 20 cents. 600,000
3,000,000 shoulders, at 6 cents ... 180,000 or 14,000,000 lbs. meat, at 17 y^g per pound.
“ I feel confident that the yield will be at least 15,000,000 lbs., at 16 cents.”
On the 4th November he wrote again, giving, in general terms, the progress in the matters of making contracts for hogs, and the prospects *436 of the adventure. General Eaton replied to this letter on the 8th November, as follows :
“Office Commissary General of Subsistence,
“ Washington City, November 8, 1864.
“Major : Your letter of the 4th instant, relating to your progress, &e., in arranging for packing pork, &c., &e., has been received.
“ Your task is a very great one, and, it is to he supposed, attended with many difficulties. While you secure the interests of the government, let your general course of action and tone as a public officer be free from any show of a disposition to injure the business interests of other parties.
“ Our packing may interfere with the business of the regular packers ; this, however, is not our object nor our wish. If it incidently occurs, and we have conducted our business in a fair and unoppressive manner, reasonable people will not complain, and the government will sustain us.
“Very respectfully, your obedient servant,
“ A. B. EATON, C. G. S.
“ Major H. 0. Symonds,
“ C. S., U. S. A., Louisville, Kentucky.”
The contracts made by Major Symonds with the claimants were dated, respectively, 25th and 27th October, and were identical, except the names of claimants. The material parts of these contracts were as follows :
“First. That the said Robert Floyd shall slaughter, dress, cut, pack, and cure into pork or bacon, fifty thousand, (50,000) hogs, as follows, or otherwise, as the commissary of subsistence shall direct.
“ Second, That, for the purpose of carrying out this agreement, the said Robert Floyd shall provide himself with such buildings, pens, tools, water, and labor of every description as shall be necessary to perform the work in the most thorough and business-like manner, and they shall receive therefor from the United States, in currency or its equivalent, the sum of ninety-two and, one-half cents (92¿c.) per one hundred (100) pounds net of hog meat, the weight to he determined by weighing the hogs when cooled ready for cutting at the block.
“ Eighth. This contract to be subject to the approval of the Commissary General of Subsistence.”
The pork-packing season in the latitude of Louisville, Kentucky, commences about the 10th of November and ends about the 25th of December in each year. The claimants, Speed & Davis, sub-let their *437 contract to Jarvis & Co., at a rate which secured to them from seventy to seventy-five cents for their time, trouble, and responsibility as the principal contractors. Mr. Floyd undertook to perform his contract himself. There were furnished to Speed & Davis, under this contract, seventeen thousand one hundred and thirty-two hogs, and to Robert Floyd sixteen thousand one hundred and seven hogs, all of which were slaughtered, packed, and cured as the contract requires. Finding hogs much scarcer and prices higher than had been anticipated would be the case, and that all the saving effected by curing would be more than counterbalanced by the increased price of pork occasioned by the government competition in the purchase of hogs, Major Symonds, with the approbation of the Commissary department, gave up the business and declined to furnish -any more hogs to either of the contractors. The proof is full and explicit that both of the contractors were fully prepared to slaughter and cure the maximum number of hogs mentioned in the contracts. All their arrangements had been made in contemplation of being furnished with the full number, and that the stoppage of the work by the United States entailed upon them a heavy loss. Speed & Davis, to avoid a lawsuit with their sub-contractors, settled with and paid them ten thousand dollars ($10,000) in damages.
Speed & Davis claim that they are entitled to recover from the United States the sum of twenty-four thousand six hundred and fifty-one dollars, ($24,651,) being at the rate of seventy-five cents on thirty-two thousand eight hundred and sixty-eight hogs (32,868) not delivered.
Floyd claims that his profits on ■ the thirty-three thousand eight hundred and twenty-three hogs (33,823) not delivered would have amounted to the sum of fifty-nine thousand six hundred and twenty-eight dollars ($59,628.) The parties respectively claim to recover the amounts stated.
The United States by their solicitors resist a recovery, in both cases, upon the following grounds :
I. That the contract is not binding on the United States :
1st. Because there was no authority of law for the Commissary department to enter into the business of packing and curing pork.
2d. Because the contracts expressly provided that they should be approved by the Commissary General, when in fact they were never so approved.
3d. Because no advertisements for proposals were published before *438 ,the contracts were made, as the act of Congress and the army regulations require.
II. Because there is no covenant or engagement on the part of the United States to furnish and pay for the whole number of fifty thousand hogs mentioned in the respective contracts.
1st. The Commissary department is charged by law with the duty of procuring and purchasing supplies for the army, under the control and direction of the Secretary of War. The act of 14th April, 1818, (sec. 7, 3 Stat., 426,) enacts that “ supplies for the army, unless in particular and urgent cases the Secretary of War should otherwise direct, shall he purchased by contract, to be made by the Commissary General on public notice, to be delivered on inspection, in the bulk, and at such places as shall be stipulated, which contract shall be made under such regulations as the Secretary of War may direct.” The same act, (sec. 6) enacts, that “ the Commissary General and his assistants shall perform such duties in purchasing and issuing of rations to the army of the United States as the President may direct.”
The act of 2d March, 1861, (sec. 10, 12 Stat., 220,) provides that “ all purchases and contracts for supplies or services in any of the departments of the government except for personal services, when the public exigencies do not require the immediate delivery of the article or articles or performance of the service, shall be made by advertising a sufficient time previously for proposals respecting the same. When immediate delivery or performance is required by the public exigency, the articles or service may be procured by open purchase or contract, at the places and in the manner in which such articles are usually bought and sold, or such services engaged between individuals.”
We do not think that these enactments limit the President to the simple right to direct and make purchases. We think the government has as much right to slaughter and pack pork for the use of the army as it has to buy beeves and kill them and distribute the meat in rations to the soldiers. This is done at all times, in every army, wherever practicable. There is no specific enactment authorizing either, but there is no prohibition. And wherever a duty is enjoined, the right to use all the necessary and proper means to perform it is implied. We find nothing in these enactments that, in our opinion, prevents the Commissary General, under the direction of the President, or Secretary of War acting in that behalf for the President, from lawfully entering into such contracts as those now before us.
2d. Was the condition that these contracts should be approved by the Commissary General either fulfilled or waived ?
*439 Under the letters and instructions from the Commissary General to Major Symonds, given in evidence, in these cases, full power and authority to make the contracts had been conferred upon the latter.
There was, therefore, no necessity that such a provision should he inserted. Tet we think its requirements are fully met by the various letters and correspondence between Major Symonds and General Eaton, the Commissary General, cited above. In these Symonds communicates to General EatonS that he had made these contracts for one hundred thousand hogs, with the main provisions and an estimate for the money necessary to carry them out. By these letters and communications the Commissary General was nearly as well advised and informed of the nature and extent of the obligations Symonds had assumed on behalf of the United States as if the contracts had been laid before him. General Eaton’s letters, in reply, are as clear and distinct a recognition and approval of them as if indorsed upon the agreements themselves.
3d. Upon the necessity for an advertisement in cases of this kind, I have given my views fully in the recent cases of Reeside and others v. The United States. My views, as there expressed, remain unchanged. I think the officer charged with the duty of buying the supplies or making the contract — the President, Secretary of War, or general commanding — is, by the law, to judge whether the exigency does or does not exist. That the party from whom he purchases the articles, or contracts with for the service, cannot know the facts, and in most cases, as matter of public safety and policy, ought not to be informed of them. He is not therefore called upon at his peril to decide whether the urgent necessity — the public exigency contemplated by the acts of Congress — exists or not. The officer in resorting to the mode provided when no exigency exists — when there are no facts to justify him — may be guilty of a wrong, and punishable for it; but where there is no participation in the wrong by the contractor, no fraud and collusion by the claimant, the contract or purchase will be unaffected by the officer’s mistake or malfeasance. Some of my brethren, however, differ with me on this question, and hold that the court is to judge, in each case, from the evidence, whether there was such an emergency— such an exigency as authorized the contract or purchase without the advertisement.
Applying the various views of the judges in this case, one of my brethren holds that the facts did not justify a departure from the mode prescribed by the acts, and that the contract is therefore void. Another, is of opinion that there was an exigency, and the proofs show *440 such an immediate and pressing urgency for these services'as justified the commissary in dispensing with the advertisement, and in contracting for these services, in the manner usually practiced between individuals. These latter views reach the same conclusion that I arrive at by a different path, and therefore result in a majority of the court affirming the right of the commissary to make these contracts.
• As this question is constantly recurring, and occasions no little difficulty and embarrassment, it is to be hoped that the judgment of the Supreme Court of the United States will before long be invoked upon that point, and that it may be put at rest.
For my own part, and speaking for myself alone, I do not think the evidence proves that there was any exigency — any such public emergency — as justified the officer who made these contracts in dispensing with the advertisements. Such may have been the facts, but I do not think they have been brought out in the proofs; in these I can find nothing, except the omission and delay of the officer charged with the duty, that discloses any pressing or urgent necessity. On the other hand, I think there was abundant time after the matter was canvassed and decided upon to have published the advertisements, and I fear their omission may have been detrimental to the United States.
But there has been no proof of any fraud or deception on the part of these claimants in procuring or making these contracts. The omission, therefore, of this important prerequisite by the agent and officer of the United States does not, in my opinion, affect the validity of the contracts, however remiss or mistaken the officer may have been.
II. A fair and just interpretation of the contract is that fifty thousand hogs were to be furnished and delivered by the United States, and that number were to be slaughtered, cured, and packed for them by the claimants, respectively. The claimants were bound to make provision in every respect and be prepared to dispose of that number. If the full extent of the agreed service had been required of them, and they had been unable or unprepared to perform it, they would have been in default; they would have been liable in damages for whatever injury the United States might' have sustained by their remissness. Mutuality, in this, respect, is but equity. Being required to prepare for that number, they had a right to insist upon that complement. It was a fair, mutual engagement to deliver fifty thousand hogs, on the part of the United States, and by the claimants to slaughter, cure, and pack them; and the claimants, as in similar cases between individuals, are to be compensated in damages for that part of their contract which the United States saw fit to abrogate or relinquish.
*441 The measure and extent of the damages are the only remaining questions to be disposed of in these eases. In the ease of Speed & Davis it is proved they had sub-let their contract, by which they had reserved to themselves from seventy to seventy-five- cents per hog. This sub-contract has not been furnished us, although Mr. Jarvis, in his deposition, says it is in writing' and professes to annex it to his deposition. On this subject we follow the rule laid down by the Supreme Court of the United States, in- the case of The Railroad Company v. Howard, 13 How. R., 307, that the profits which the party would have made, or the difference between the cost of doing the work and the price to be paid for it, is the rule óf damages in cases of this kind. In the application of the rule we find great difficulty. In many cases we have in some measure to be governed by the opinions of witnesses. These are nearly always unsatisfactory and .often unsafe guides. In the cases of Moore and Boice v. The United States, 1 C. Cl’s R., 90, and Theo. Adams v. United. States, 1 C. Cl’s R., 106, where we adopted the rule, but to a great extent discarded the opinions of .witnesses on the one side and the other, and rested our findings on the facts and elements for computation furnished by the proofs. The subcontract with Jarvis & Co. is probably as true a criterion as could be obtained. What competent, skilful, responsible persons are- willing to undertake the performance of any work for, and do really bargain to perform it, is a fair mode of estimating what it will cost.
From the amount reserved on the sub-letting is to be deducted a reasonable sum, on account of the relief of the contractor from responsibility for a large part of the contract, and for the time and trouble which a full performance would have required and imposed upon him. The balance will show the. clear net profits that would have accrued on the unperformed part of the contract, and the damages to which the claimants are entitled. As they were relieved, by the relinquishment of two-thirds of the contract by the United States, of all the responsibility and risks involved in so much of it, as well as from devoting their time and attention to it to that extent, there ought to be a reasonable deduction on those accounts. Applying these rules and principles to the cases in hand, we think that, making all reasonable deductions, the sum of sixty (60) cents per hog would represent the true net profits to the contractors.
Nor do we see any good reason for making any distinction between the two . cases. They are identical: for the same number of hogs, to be slaughtered at the same place, at the same time, in the same manner, at the same price. The application of the same rule ought to *442 produce the same result, although, in the opinion of the witnesses testifying, the damages in the Floyd case would he nearly treble that claimed in the Speed & Davis case. The opinions of these witnesses prove too much, if they are not mistaken. ' They would make the clear profits of Floyd’s contract nearly eighty per cent, of the total sum to he received for the service. Such an exhibition would expose a contract to great suspicion of unfairness or collusion, or that an undue advantage had been taken of the ignorance or incompetency of the officer in reference to the subject-matter of the contract. The claimants put in evidence Major Symonds’s letter to the Commissary General, in which he states that the profits to be made by the contractors would he about forty cents per hog. Instead of that, Mr. Floyd now attempts to show that his would have been more than three times that sum.
It shows how carefully testimony resting merely on the opinions of witnesses, however respectable and truthful they may be, should be weighed and considered, and how uncertain it is as to amounts. We therefore adopt and apply the same rule in both cases.
We therefore find as follows, in the case of Speed & Davis : 32,868 hogs at 60 cents, amounting to nineteen thousand seven hundred and twenty dollars and eighty cents, (#19,720 80,) for which sum judgment is to be entered in their favor.
In the case of Robert Floyd we find thirty-three thousand eight hundred and twenty-three hogs not delivered, at sixty cents per hog, amounting, in the whole, to the sum of twenty thousand two hundred and ninety-three dollars and eighty cents, (#20,293 80,) and for which a judgment is entered in favor of said Robert Floyd.