Millig-AN, J.,
delivered the opinion of the court:
The contract which constitutes the foundation of this action was made without previous advertisement •, and the principal question in the case is as to the claimant’s right to hold the United States responsible for its breach. The Assistant Attorney-General makes no objection to the claimant’s right of recovery, other than the want of conformity in the contract to the acts of Congress, respectively, approved March 2, 1861, (12 Stat. L., p. 220,) June 2, 1862, (12 Stat. L., p. 412,) and July 4, 1864, (13 Stat. L., p. 394.)
It can scarcely be necessary to review these statutes at length, since they have been so recently considered in the cases of Cobb, Christy & Co., (7 C. Cls. R., p. 470,) and John A. Thompson & Co., (ante.) In the former, the court held, without dissent, that the purchase of military supplies for a military emergency during the rebellion is governed exclusively by the Act July 4, *295 1864, and not by the Act March 2,1861, nor the Act June 2, 1862.
Since this decision we have had no occasion to change or modify it, and therefore farther consideration of the acts of 1861 and 1862 may be dismissed.
The act of 1864 alone governs this case, as it did the decision of Cobb, Christy & Co., which, in its facts and circumstances, is essentially the same as this. The chief difference in the two cases is found in the fact that in the former the contract was in parol and in the latter in writing. The same military emergency existed in both cases, and the commanding general’s authority to purchase supplies in the open market is proven in each case by precisely the same testimony.
In this case, as well as in Cobb, Christy & Co., the chief quartermaster at Nashville was specifically, though informally, informed by General Thomas of the emergency, and charged with the duty of providing for it in the most expeditious manner in his power.
Under this authority the quartermaster at Nashville at once appealed to the chief quartermaster of the division at Louisville for aid, and he, being unable to furnish it, in turn applied to his subalterns at Cincinnati and Saint Louis, but no adequate supplies could be furnished by either. None could be obtained from the heads of divisions charged with furnishing such supplies, or from any established depot of the Quartermaster Department. What, in such circumstances, was to be done ? The emergency was imminent, and the order of the commanding general unrevoked.
Theheads of the quartermaster departmentin Nashville, Saint Louis, and Cincinnati met in General Allen’s office at Louisville, and after consultation as to the necessities of the department, determined that the most expeditious manner of procuring the needed supplies within time was to purchase them in the open market.
Under such circumstances this contract was entered into, and the claimants at once began its execution, and at the time performance was stopped by the defendants they had delivered more than three-fourths of the grain required under it, and had on hand enough to complete its fulfillment.
The justice of the claimant’s demand is not denied, but this court can afford no relief unless the contract was authorized by *296 law; and since in Cobb, Christy & Go. we upheld a parol contract, made under the same circumstances, and to meet the same emergency, it is difficult to see bow we can refuse to sustain this contract.
The act of 1864 was passed during the war, and for exactly such cases as are presented in this record; and without it the movements of great armies in the field, exposed to the accidents and misfortunes of war, would often be greatly crippled or rendered wholly powerless at the very time they should put forth their greatest strength.
To provide against such contingencies, the legislature has wisely clothed the commanding officer with power to order the chief quartermaster of his army or detachment to procure the necessary supplies, during the continuance of an emergency, without advertisement, and in the most expeditious manner. {Act July 4, 1864,13 Stat. L., § 4, p. 396.)
The commanding officer’s order confers on the chief quarter-muster new and additional powers, which he could not exercise without it; and after it has been given, he is clothed with a broad discretion to procure the needed supplies in the most expeditious manner. The order has the force of law, and the exercise of the authority conferred by it necessarily carries with it the right in the chief quartermaster to use all the aids and machinery which his department furnishes to effectuate the new and additional power with which he is thus clothed. He can thereof in person, or through his inferior officers, procure the needed supplies during the continuance of the emergency directly by purchase in the open market, or by verbal or written contract, as the circumstances of each, case may justify; and in either event the contract of purchase as effectually binds the United States as if it had been made in the regular way under previous advertisement.
A narrower construction of the Act July 4,1864, and a more-restricted limitation on the power conferred by the commanding officer’s order in cases of emergency, would render the statute itself ineffectual to meet a great exigency like the one under consideration; for it would be impossible for the chief quartermaster in person to make all the necessary purchases immediately and literally in the open market, or, in fact, to procure in time the quantity of supplies required, without the aid of his subalterns and the power to contract for deliveries to meet the exigency.
*297 By the terms of tbe statute tbe commanding officer’s order is addressed to tbe “ chief quartermaster of tbe army or detachment ” in which tbe exigency exists, and the power to purchase in the open market, without advertisement, thus communicated to him, is carried down through the bead of the department to all his subalterns authorized by law to make contracts or purchases for supplying such army or detachment, and the order need not be repeated to such inferiors, or contracts made by them otherwise specifically recognized by the commanding officer. It is enough, after the exigency has been declared, that tbe chief quartermaster is ordered, as in this case, to meet the emergency, and to procure tbe necessary supplies in tbe most expeditious manner.
The length of time this power can be exercised is limited by the words of the statute to the continuance of the emergency; and the way in which the quartermaster discharges the duties thus imposed upon him, as before stated, rests wholly in his own discretion. But he must always take care how he exercises that discretion, not because it will affect the validity of contracts made under it, but because it may affect the settlement of his accounts in the department to which he is responsible.
From this view of the whole case we think it clear the contract was not only authorized by the act of 1864, but necessary to meet a great exigency, running through a period of several months and pervading the whole western division of the Army, on the success of whose movements, at that particular time, greatly depended the final overthrow of the rebellion.
Admitting the validity of the contract, there is little controversy as to its breach. The contract bears date the 10th of January, 1865, and the corn was to be delivered at the rate of 150,000 to 200,000 bushels per month. Assuming the claimant would have fulfilled his contract by delivering 150,000 bushels per month, he would havehad until the 1st of May, 1865, within which to deliver the whole 500,000 bushels. The notice to stop the delivery was given on the 11th of April, 1865, so that it is apparent the claimant was in no, default on his part, and the breach by the defendants was clear and undisputed.
It is true, the amount of corn actually delivered at the date of the notice was not altogether equal to the minimum rate at which it was to be delivered per month; but this clearly resulted from the defendants’ own acts. The claimant was ready *298 and anxious to deliver the grain faster than the defendants were prepared to receive it; and at their request, shortly before the notice to stop, the delivery was retarded and held back under the direct promises of the defendants’ agents that they would receive the grain as rapidly as they could handle it.
The next and only remaining question is as to the damages. The rule in this character of cases is so well settled, that we need not multiply authorities to establish it. This court has uniformly recognized the rule to be the difference between the contract price and the market price when the article contracted for should hare been received. (Cobb, Christy & Co. v. The United States, 7 C. Cls. R., p. 471; Wilder v. The United States, 5 C. Cls. R., p. 468; also Hughes & Fuller v. The United States, 4 C. Cls. R., p. 64.)
The claimant in this case not only tendered performance, but was fully able, willing, and ready to perform; and, under the universally-recognized rule of damages in such cases, he is entitled to recover the difference between the contract price of the corn and its fair market value at the time it should have been received by the defendants.
When the quartermaster refused to receive any more grain, it appears there were 124,377 bushels undelivered on the contract, which was then fairly worth in the market 76 cents per bushel, making the difference between the contract and market prices 80 cents per bushel.
Judgment will, therefore, be entered in favor of the claimant for $99,601.60.