Drake, Ch. J.,
delivered tbe opinion of tbe court:
This suit is brought to recover damages averred to have-been sustained by tbe claimant through acts of officers of tbe *327 Army engaged in the suppression of the rebellion; which act® are alleged to have been performed under military orders authorized by the first section of the “ Act to authorize the President of the United States, in certain cases, to take possession of railroad and telegraph lines, and for other purposes,” approved January 31, 1862 (12 Stat. L., 334), which is as follows:
“That the President of the United States, when, in his judgment, the public safety may require it, be, and he is hereby,, authorized to take possession of any or all the railroad lines in the United States, their rolling stock, their offices, shops, buildings and all their appendages and appurtenances; to prescribe, rules and regulations for the holding, using and maintaining of the aforesaid railroad lines, and to extend, repair and complete the same in the manner most conducive to the safety and interest of the Government; to place under military control all the officers, agents, and employees belonging to the railroad lines thus taken possession of by the President, so that they shall be considered as a post-road and part of the military establishment, ofthe United States, subject to all the restrictions imposed by the rules and articles of war.”
Under the authority of this provision the President of the United States, through the Secretary of War, caused the following order to be promulgated:
“War Department,
“ Washington City, D. G., May 25, 1862.
“ Ordered:
“By virtue of the authority vested by act of Congress, the-President takes military possession of all the railroads in the United States from and after this date until further order, and directs that the respective railroad companies, their officers and servants, shall hold themselves in readiness for the transportation of troops and munitions of war, as may be ordered by the military authorities, to the exclusion of all other business.
“By order of the Secretary of War.
“M. C. Meigs,
“ Quartermaster- GeneralP
On the 24th of December, 1803, Major-General U. S. Grant, then in command of the Military Division of the Mississippi, caused to be issued a general order, in the following terms:
“By authority of the Secretary of War, par. 7 of his special order of date Louisville, Kentucky, October 19,1863,in reference, to military railroads, will bereplaced by the following: The Quartermaster’s Department will have control of military railroads, so far as relates to the transmission of military freight and military passengers, with power to exclude such other freight and passengers as may be deemed necessary.”
*328 On the 11th of January, 1804, Brigadier-General and Chief Quartermaster Robert Allen issued the following order to Col. William Myers, chief quartermaster of the Department of the Missouri:
“Office of the Chief Quartermaster,
Louisville, 11th Jany., 1864.
“Colonel: In consequence of the obstruction to river navigation, the full force of all the railroads leading from the source of supply is required. The Illinois Central is one of these roads, and whatever government freight you may have at any point for shipment over this road must be carried to the exclusion of all private property, if necessary. Further, whatever supplies the government agents may have contracted for, or may hereafter contract for, must take precedence of private freight.. These are orders of Major-General Grant. You will accordingly make requisitions upon the Illinois Central R. Road agents for transportation to the full extent of their means, if necessary, and the same of any other roads along the line of which you may have freight.
“Very respectfully, your ob’t servant,
. “Robt. Allen,
“ Brig. Gen. & Oh. Q. M.
“Col. War. Myers,
“ Chief Q. M., St. Louis.”
Upon this order Colonel Myers made the following indorsement, and communicated the order and the indorsement to the claimant:
■ “Office Chief Q. M. Dept, of the Mo.,
“ St. Louis, Jan. Í6, 1864.
“This copy is respectfully furnished for the information and guidance of the officers of the Illinois Central Railroad. All such transportation as is referred to herein will be approved and ordered by the chief Q. M. in charge of the depot.
“W. Myers,

“Col. & A. Q. M.”

Afterwards, in the winter of 1864-’5, the officers of the Quartermaster’s Department, on duty in the State of Illinois, in contracting for the purchase of forage for the Army engaged in the suppression of the rebellion, made numerous and very large requisitions upon, the claimant for transportation on its railroad of forage which contractors had undertaken to deliver at Cairo. This transportation, though required by government officers, was not to be performed for the government, nor to be *329 paid for by it, but for tbe contractors and to be paid for by them.
All forage transported by the claimant to Cairo for contractors, under such requisitions, had to be inspected and accepted by the officers of the Quartermaster’s Department stationed there, before being delivered to and received by “them. A large amount of the forage taken by the claimant to that place in January and February, 1865, was rejected by those officers, and had to remain in the claimant’s cars on the tracks there, because neither the claimant nor the contractors had provided storage therefor in Cairo. Owing to that fact, and to the further fact that the amount of forage sent to Cairo, and inspected, accepted, and received by the government officers, was largely in excess of what could be stored and forwarded by them, with the means at their command, the claimant’s tracks, side tracks, and other terminal facilities at Cairo became blocked up; in consequence whereof the claimant was unable to bring into Cairo, and was obliged to side-track and hold at stations along the line of its road large quantities of forage which it had received for transportation to that place.
Among the contractors for the delivery of forage was a firm of Cobb, Blasdell & Co., who, during the winter of 1865, had had transported over the claimant’s road to Cairo some 800,000 bushels of oats for the government, under requisitions of transportation made by the officers of the Quartermaster’s Department. Besides this quantity, Cobb, Blasdell & Co. had bought for transmission to Cairo, for the government, some 300,000 bushels more of oats, for which the claimant had, prior to the month of March, 1865, agreed with them to furnish transportation; but which it failed to transport when tendered to it by Cobb, Blasdell & Co., in March, 1865, for that purpose. For this breach of its contract, Cobb, Blasdell & Go. sued the claimant, and recovered judgment for damages in the sum of $211,120.95; which judgment was satisfied by the claimant by the payment of $200,000.
The claimant sued the United States to recover this sum, and expenses paid by it in defending Cobb, Blasdell & Co.’s ■suits.
In the case as thus stated, it is necessary, in order to charge the defendants at all, to find a contract, express or implied, on the part of the government. There is no averment of the exist *330 ence of an express contract; but tbe claimant’s petition, after setting out tbe facts relied on, thus avers an implied contract:
“And your petitioners say that tbe Government of the United States, in subjecting your petitioners, their officers, agents, and servants to tbe orders and control of the Quartermaster’s Department and military authorities of tbe government as aforesaid, and in obstructing and preventing yonr petitioners as aforesaid from transporting the said grain of tbe said Cobb, Blasdell & Co., undertook and promised your petitioners, by an implied contract, to indemnify and save harmless your petitions from all loss and damage which they might suffer in consequence thereof. Wherefore and because of the said several matters and things hereinbefore set forth, your petitioners ask judgment against the defendant in the sum of $217,403.30, so paid by your petitioners as aforesaid.”
So much of this averment as alleges that the government subjected the claimant, its officers, agents, and servants to the orders and control of the Quartermaster’s Department and the military authorities is found to be true; but the remainder is not so found; and the real facts are those set forth in part of finding IX, and in findings X and XI, as follows:
“ During the winter and spring of 1805 the claimant carried into Cairo only such forage as was ordered by the Quartermaster’s Department; and a large portion of the forage carried into Cairo during that time by claimant under the orders of the Quartermaster’s Department was rejected by the government inspector of forage at Cairo as unfit for the Army. After the month of December, 1804, from one-half to three-fourths of all. the corn and a very great portion of the hay were rejected as unfit for the use of the Army. And the forage thus rejected by the inspector was refused to be received or unloaded by the Quartermaster’s Department.
“So great was the amount of forage thus rejected that after all of claimant’s warehouses in Cairo (which were sufficient for the ordinary and usual business of the road) had become full, and all the private warehouses and other. storage facilities in Cairo had become full, the claimant for want of storage room at Cairo was obliged to hold large quantities of ir in its cars on the side tracks at Cairo (which side tracks were sufficient for the ordinary business of the road), and said side tracks were filled with cars containing rejected forage.
“ Owing to the large amount of rejected forage which accumulated at Cairo, and for which there was no sufficient storage, and which therefore remained in the cars, as above stated, and owing to the very large orders issued by the officers of the *331 Quartermaster’s Department for transportation of grain, to am amount far in excess of that which could be stored and forwarded by the officers of that department at Cairo, with the means then at their disposal, the tracks, side tracks, and other terminal facilities of the claimaint at Cairo became blocked up; and in consequence thereof the claimant was unable to bring into Cairo, and was obliged to side-track and hold at stations along the line of its road large' quantities of forage which it had received for transportation to Cairo for the Q u artery aster’s. Department; whereby some of the forage became heated, and was rejected by the government officers at Cairo.”
If there was any implied contract on the part of the government it grew out of the facts thus found; which, it will be observed, make a different case from that upon which the claimant’s petition relies.
The petition charges upon the government the whole respon-. sibility of obstructing the claimant’s road, and consequently disabling it to transport Cobb, Blasdell & Co.’s grain; but the facts as found do not sustain that position.
The charge rests upon two grounds : 1. That in consequence' of the large quantities of grain rejected by the government, inspector of forage at Cairo the claimant’s warehouses there became filled with such rejected forage and other grain, and ■ the claimant was unable to store the same; and its side tracks. ■ there, which were sufficient and ample for the usual and ordinary business of the road, “ became and were wholly filled and occupied with cars loaded with such rejected grain and other-forage, and forage awaiting inspection and reception; and the claimant was unable to dispose of the same, or to clear their sidetracks thereof”5 and, 2. That the government officers delayed, neglected, and refused to receive with reasonable diligence from the claimant large quantities of government forage transported by it to Cairo under orders of the Quartermaster’s. Department.
This second ground is not sustained by the facts found, and we therefore lay it aside.
As to the first ground, we will suppose that there might be a case of such blocking up of the claimant’s road with freight, transported by order of the government officers, to the exclusion of private freight, that, in spite of all the claimant’s efforts,., it would be compelled to violate a contract with an individual, and in consequence thereof be subjected to damages 5 and that. *332 upon that state of facts, a contract might be implied, on the part of the government, to indemnify the claimant against those damages; yet between such a case and this there are material points of difference.
In the first place, let it be noted that it was not until the 5th -of March, 1865, that Cobb, Blasdell & Co.’s grain was tendered to the claimant, and the claimant failed to transport it according to its agreement with them.
In the next place, let it be observed that the rejection of forage at Cairo began, most probably, with the very beginning of the year 1865; or, in the language of finding X, “after the month of December, 1864, from one-half to three-fourths of all the corn, and a very great portion of the hay, were rejected.” We are justified by that finding in holding that at least two weeks before the 5th of March the blocked-up condition of the road began at Cairo.
In the third place, let it be noted that the claimant does not aver, nor is it found as a fact, that when it found its warehouses full and its tracks blocked up with cars containing rejected and other forage it made any effort to remove the rejected forage from the cars or the cars from the tracks.
Upon this state of the case there are well-established legal ■doctrines which to us seem clearly to forbid any implication against the government of a contract on its part to indemnify the claimant against the damage to which it was subjected through Cobb, Blasdell & Co.’s recovery.
1. He who seeks legal redress must not only show his adversary to be in the wrong, but must also be prepared to prove that no negligence of his own tended to increase or consummate the injury.
2. He cannot recover compensation for any damage which he might have avoided by the use of ordinary care and diligence, ■after first becoming aware of the injury of which he complains.
3. Much more, if he proximately contributed by his own or his agent’s negligence to produce the injury, so that, but for his ■concurring and co-operating fault, the injury would not have happened to him, he cannot recover at law or in equity.
These almost axiomatic rules of law are fatal to any implication, growing out of the facts of this ease, of a contract on the part of the government to indemnify this claimant against loss ■or damage on the grounds alleged.
*333 It cannot be questioned that the claimant’s officers, servants, and agents knew, first, that the officers of the Quartermaster’s Department at Cairo would inspect all military supplies transported to that place by the claimant for contractors, and would receive only such of those supplies as, upon inspection, those officers should approve and accept; second, that such supplies were, in January and February, 1885, being constantly shipped by contractors, at various points on its road, for delivery at Cairo; and, consequently, third, that if the road should become- and be allowed to remain blocked up at that place, the difficulty would inevitably extend northward along the lines of the road to an indefinite extent.
Knowing all this, it was the clear obligation of the claimant,, with all needful diligence, to remove the rejected supplies from its tracks at Cairo. If it had done so, there is nothing tending to show that it would have had any difficulty in carrying Cobb,. Blasdell & Co.’s grain according to its agreement with them.. It made no effort to remove from its Cairo traeks the cars containing those rejected supplies, and hence the disabled condition. of the road there, and along the lines northward.
It is no sufficient answer to this for the claimant to say that it had not at Cairo sufficient warehouses or sheds in or under-which to empty its cars of those supplies; and that it could not pitch the supplies out upon the ground in an unsheltered and exposed condition without becoming liable in damages to the owners thereof; for its dut3r was to have all the warehouses and sheds that were necessary to contain so much of the rejected supplies as it could not otherwise put out of the way, and so leave its tracks open for accruing use. Its failure to have such shelter for those supplies was negligence, which proximately contributed to produce the state of things out of' which eventuated the claimant’s liability for damages to Cobb, Blasdell & Co.
Such being the case, what ground is there for charging the-United States as upon an implied contract1? ‘‘Implied contracts,” says Blackstone, “are such as reason and justice dictate, and which therefore the law presumes that every man undertakes to perform.” An implied contract, therefore, is coordinate and commensurate with duty, and whenever it is certain that a man ought to do a particular thing the law supposes him to have promised to do that thing. Does reason,. *334 justice, or duty dictate that tlie United States should repay to the claimant the damages recovered from it by Cobb, Blasdell & Co. for its failure to fulfill its contract with them, when that 'failure resulted from its own neglect to do what, under the cir•cumstances, reason, justice, and duty required it to do? To ask such a question is to answer it emphatically in the negative. There is, then, no possible ground for finding an implied contract on the part of the United States to indemnify the claimant against any loss or damage growing out of a blocked-up condition of the claimant’s road, which it was the claimant’s duty to have prevented, which it had the time and the power to prevent, and which, with a full knowledge of all the facts •from the very beginning of that condition, it took no steps to prevent.
But laying aside all those views, and supposing that there was an implied contract of indemnity, as averred by the claimant, and that there was no fault whatever on its part, the damages claimed are, in our judgment, quite too remote to -authorize a recovery here.
■ The law refuses to take into consideration any damages remotely resulting from the act complained of. This proposition, •or one correlative to it, is expressed in the maxim Causa próx-ima, non remota, speotatur ; or, in the language of Lord Bacon, “it were infinite for the law to judge the cause of causes and their impulsion one on another. Therefore, it contenteth itself with the immediate cause, and judgeth of acts by that without looking to any further degree.” (1 Sedgwick on Damages, 7th Ed., 91.) And says Greenleaf, “the damage to be recovered must be the natural and proximate consequence of the act complained of.” (2 Greenleaf on Evidence, § 253.) Was Cobb, Blasdell & Co.’s recovery against the claimant the natural and proximate consequence of any act of government officers ? Not •at all, even on the claimant’s own showing. Those officers required nothing of the claimant but that it should transport -supplies for contractors. One of the results of the transportation was that the claimant’s road got blocked up at Cairo with •cars containing rejected supplies. Supposing the claimant •entirely blameless in connection with that result, and the government liable for damages on account of it, its liability would •extend only to compensation for the injury done then and there ■by the blocking up of the road. But between the acts of the *335 ■government officers and the accruing of tbe claimant’s liability to Oobb, Blasdell & Go. an act of the claimant intervened, of which those officers bad no knowledge or notice, and without the doing of which there could have been no recovery by Oobb, Blasdell & Oo., namely, the claimant’s contract with that firm to transport their grain to Cairo at a certain time. It was for its failure to fulfill that contract that Oobb, Blasdell & Co. recovered judgment against it. This was a matter with which the government had no sort of privity, and of which its officers had no knowledge; which was brought about by the claimant’s own voluntary and independent act, and which had no fair or legitimate connection with the orders or proceedings of those officers. The damage resulting from it to the claimant was, therefore, so remote from anything that could legally and naturally have been expected to follow the acts of the government officers that it can form no foundation for a judgment against the TTnited States in this suit.
Other points adverse to this claim might be made, but we need not present them. The claimant has no cause of action, and its petition is therefore dismissed.