*528 OPINION.
Davis, J.,
delivered the opinion of the court:
This is an action to recover damages for breach of an alleged agreement by the defendants to purchase oats of the claimants. The measure of damages sought to be obtained is the difference between the alleged actual sale of the quantity said to have been refused by the defendants, and the contract price, which the petition charges to have been $216,628.
The contract is- alleged' as a verbal contract, made in an emergency, declared such by General Thomas, and the alleged object of the contract was the supply of General Thomas’s army with forage. This emergency and some contracts said to have been made under it were before this court in the cases of Cobb, Christy & Co. (7 C. Cls. R., 470); John A. Thompson et al. (9 C. Cls. R., 187); O. P. Cobb (9 C. Cls. R., 291); and The Illinois Central Railroad Company (16 C. Cls. R., 312).
The first question raised at the trial was one which the court had to settle before it could make its findings of fact. The claimants.called as their witness Oapt. William Ourrie, the quartermaster with whom the contract is alleged to have been made, and asked him the following question:
Interrogatory 3. Please state whether yon had a verbal agreement with claimants in January, 1865, to purchase at various places in Illinois, and ship to Cairo, Illinois, an indefinite number of bushels of oats for the use of the Army of the United States, to meet the emergency you have spoken of, said purchases and shipments to continue until claimants were notified that the emergency had passed; and also, the price; and also, whether claimants entered upon the performance of that agreement, and how far they did perform it; how many bushels of oats they actually delivered and were paid for, and ho w many wore purchased within the time of the continuance of the emergency by them, anel offered .to be delivered, but declined by the Government officers.
The counsel for the United States objected to this question at the examination as “ leading and suggesting its own answer,” and renewed the objection at the trial, coupled with a motion to strike out the interrogatory and answer. *
The objection is sound under the rules for the examination of witnesses in common-law trials, and would doubtless be sustained in a purely common-law court. If the answer to this question were the only evidence touching the contract; or if *529 the defendants had no opportunity of cross-examination ; or if the cross-examination had revealed the witness to be what is called a willing witness for the claimants, we might have felt it our duty as a common-law court to grant the motion. On the other hand, reasons which forbid a court to submit evidence thus obtained to a jury have less weight here. Being reluctant to shut up any avenue to truth, and being satisfied that from the cross-examination of Currie and from other evidence taken in connection with the answer to the objected interrogatory we have the substantial truth as to these transactions, in the wide discretion reposed in this court we overrule the motion.
On the findings as settled by this and the other evidence, there are several objections to the claimants’ right of recovery.
1. The alleged excuse for the substitution of a verbal contract in the place of a written contract in the form then and still required by law (12 Stat. L., 411,- B. S., § 3744) is the declaration of the commanding officer of the existence of an emergency. Waiving for the present the question whether the contract in suit was made in that emergency, we will .consider the factá as to the alleged emergency. •
Two acts regulating purchases without advertisements were in force when this contract was made.
1st. The provision in section 10 of chapter 84 of the Acts of the second session of the Thirty-sixth Congress, approved March 2,1861, before the outbreak of the war (12 Stat. L., 220; It. S., § 3709), that—
When immediate delivery or performance is required by the public exigency, the articles or service required may be procured by open purchase or contract at the places and in the manner in -which such articles are usually bought and sold, or such services engaged between individuals.
This was the statute under which the contract in Speed’s Case was made (2 C. Cls. R., 429; 8 Wall., 77; 7 C. Cls. R., 93). It is not claimed that the claimants’ contract was made under that authority.
2d. The other provision is found in the fourth section of the Act of July 4, 1864, ch. 253 (13 Stat. L., 396). It was a temporary power, which ceased with the rebellion, and is not codified. The provision was—
That when an emergency shall exist requiring the immediate procurement of supplies for the necessary movements and operations of an army or detachment, and when such supplies cannot be procured from any established depot of the Quartermaster’s Department or from the head of the *530 division charged with the duty of furnishing such supplies within the required time, then it shall be lawful for the commanding officer of such army or detachment to order the chief quartermaster of such army or detachment to procure such supplies during the continuance of such emergency, hut no longer, in the most expeditious manner and without advertisement ; and it shall he the duty of such quartermaster to obey such order; and his accounts for the disbursements of moneys for such supplies shall be accompanied by the order of the commanding officer as aforesaid, or a certified copy of the same, and also by a statement of the particular facts and circumstances, with their dates, constituting such emergency.
This is the act on'which the claimants rest their case. There is no question that it proposes to set aside the stringent provisions respecting advertisements and competition for contracts only ón a written order by the commanding general who is formally to assume this responsibility. The effect of the verbal order of General Thomas was before this court in Thompson's dase (9 O. Cls. B., 187), and was disposed of by the court as stated in the syllabus in the report by Judge Nott, who spoke for the court both in the opinion and as official reporter. The syllabus says:
It is not free from doubt but that under the Act of July 4, 1864 (13 Stat. L., $ 4, 394), a vendor dealing with a quartermaster is bound to ascertain that the commanding general has exercised the discretion vested in him by the statute relating to procuring supplies in a military emergency, and has signified it by a proper order; but the majority of the court hold that this obligation is not imposed upon the contractor, and that he may rely upon the presumption that the officer with whom he deals is authorized to • make the purchase.
The court as now constituted has carefully considered this ruling, and are unanimously of opinion that it must be reversed in part. It is entirely free from doubt'that the commanding general had no authority to declare an emergency except in writing, and that the declaration by General Thomas being verbal there was ho lawfully-declared emergency in this case. We are of opinion that contractors were equally bound to know this provision of law and this state of facts; and on the authority of Clark's Case (95 U. S. R., 539) we hold that while, in the absence of fraud, they could recover on a quantum meruit the contract price on the executed part of their contract, they cannot make a contract entered into in violation of law the foundation for a recovery of■ damages for the unexecuted part of it.
2. Thus far we have assumed that the claimants’ alleged contract was made under the verbal declaration of emergency *531 leave this fact in grave doubt. They show that in November, 1864, a general concentration of troops under General Thomas began at Nash-' ville, with a view to offensive operations; that about the 1st December large stores of grain which had been collected for the use of this army were burned by the enemy; that General Thomas convened several meetings of his-staff officers, in the course of which, “after consultation with his quartermasters as to what was best to be done,” he gave verbal orders whose “general terms were an urgent demand on the part of General Thomas upon the officers to hurry up the supply of forage; that the supply was limited and there was a pressing necessity for the forage; that about the middle of December, Colonel McKim, the quartermaster at Cincinnati, went to Louisville and consulted with General Allen, the department quartermaster-general; that it was then decided that every possible means must be put in requisition to meet the emergency, and the main dependence was in the Cincinnati depot; that somewhere about the 23d December, 1864, extensive verbal contracts were made by the Cincinnati quartermaster for meeting the emergency; and that on the 2d January, 1865,'ten days later, General Allen telegraphed to Colonel Myers, the quartermaster at Saint Louis: ■
Cumberland is falling fast. The price must not he an excuse; dispatch is everything. How-much can I count your sending in,the next ten days to Cairo from all quarters t
necessary a judgment for the claimants on this state of facts, we should hesitate before doing it. Before this telegram was sent to Colonel Myers a month had elapsed after the cause of the emergency had taken plane and ceased; ftomtwo to three weeks after the emergency .had been declared by the commanding general had elapsed; a like time after it had been decided to make the main dependence upon the Cincinnati depot; and ten days after contracts had been made Cincinnati for meeting the emergency. It appears by the findings that purchases were going on at Saint Louis in the month of December in the usual way. The claimants themselves made a written contract on the same 5th January for delivery of 200,000 bushels oats, pursuant to an-advertisement dated December 29. This shows that prior to the meet *532 ing on the 5th. January the alleged emergency to the Saint Louis purchases. When we reflect that these acts of the parties reveal a contract made on a previous advertisement of seven days, we find some difficulty in extending an emergency created on the 1st December so as to cover contracts made on and after the 5th January, notwithstanding authority of Cobb’s Case (9 C. Cls. R., 291) to the contrary.
It is more probable that General Allen, gency, intended to impress upon his subordinates at Saint Louis the importance of preventing another by hurrying- forward supplies to Cairo and from thence to Nashville before the close of transportation, and within ten days; and it is not open to dispute that he required a statement of the amount that was to be forwarded under these orders within the next ten days, and did not contemplate leaving anything indefinite on that head.
As it is not necessary to rest a judgment for the on this point, we content ourselves with pointing out the difficulties which they present to the claimant.
3. Assuming that we are wrong there was an emergency existing at the time when the claimants’ contract was made, and that the claimants were not bound to inquire whether that emergency had been declared in the manner provided by the statute, there still remains the question whether it exempted the parties from the operation of the acts requiring contracts to be in writing.
On the 2d June, 1862, Congress a ject is expressed in its title: “An act to prevent and punish fraud on the part of officers intrusted with the 'making of contracts for the Government.” The first provision in this statute was:
That it shall be the duty of the Secretary of War, of the Secretary of the Navy,* and of the Secretary of the Interior, immediately after the passage of this act, to cause and require every contract made by them, severally, on behalf of the Government, or by their officers under them, appointed to make such contracts, to be reduced to writing and signed by the contracting parties with their names at the end thereof. (T2 Stat. L., 4X1; E. S., § 3744.)
In Cobb, Christy & Company’s Case (7 C. Cls. R., 470) it was contended that this statute was mandatory and took effect upon contracts made under a declared emergency. The court did not question that the statute is mandatory in ordinary *533 cases, but held that it did not 'apply to contracts made in an emergency and sustained a verbal contract in every respect like the one now in suit.
Since that time Clark's Case (95 U. S. R., 539) has been decided by the Supreme Court. In its opinion that court says:
The Court of Claims lias heretofore held, this act to be mandatory, and as requiring all contracts with the Departments named to be in conformity with it. The arguments by which this view has been enforced by that court are of great weight, and, in our judgment, conclusive. The facility with which the Government may be pillaged by the presentment of claims of the most extraordinary character, if allowed to be sustained by parol evidence, which can always be produced to any required extent, renders it highly desirable that all contracts which are made the basis of demands against the Government should be in writing. Perhaps the primary object of the statute was to impose a restraint upon the officers themselves, and prevent them from making reckless engagements for the Government; but the considerations referred to make it manifest that there is no class of cases in which a statute for preventing frauds and perjuries is more needed than in this. And we think that the statute in question was intended to operate as such. It makes it unlawful for( contracting officers to make contracts in any other way than by writing, signed by the parties. This is equivalent to prohibiting any other mode of making contracts. ^Every man is supposed to know the law. A party who makes a contract with an officer without having it reduced to writing is knowingly accessory to a violation of duty on his part. Such a party aids in a violation of the law. We are of opinion, therefore, that the contract itself is affected, and must conform to the requirements of the statute until it passes from the observation and control of the party who enters into it. * * * We do not mean to say that where a parol contract has been wholly or partially executed and performed on one side the party performing will not be entitled to recover the fair value of his property or services. On the contrary, we think that he will be entitled to recover such value as upon an implied contract for a quantum, meruit.
This course of reasoning is even more applicable to a contract made in an emergency, without the usual safeguards and supervision, than to a contract made in the ordinary course of the business of a Department; and as the Supreme Court except nothing from the operation of the act, but expressly says that its language is equivalent to preventing any other mode of making contracts, we feel ourselves constrained to reverse the former ruling of this court, and hold that a contract like that now set up is invalid as a bisis for the recovery of damages for a breach of performance on the part of the United States.
4. Thus far we have treated the case as if the contract proved *534 and set forth in the findings was the contract set forth in the claimants’ petition. The disputed contracts are recited in findings YII and VIII, in the following language:
By direction of Colonel Myers, Captain Currie called together in liis office at Saint Louis tlie various contractors wlio had theretofore been in the habit of supplying* that department with forage, among whom were the claimants. A memorandum was made of the amount of oats and corn then in the hands of the respective parties, and each party for him or themselves agreed with said Currie to deliver the amount then held by him or them at a price which was fixed for the oats at 98.2 cents per bushel. The following is a copy of that memorandum. The 100,000 bushels of oats therein standing opposite the names of the claimants was delivered and paid for at the contract price.
St. Louis, Mo., Jan. 5, 1865.
We, the undersigned, agree to deliver at Cairo, Illinois, or St. Louis, Mo., the amount of hay, oats, or corn set opposite our respective names, within twenty days from this date, subject to the conditions specified in advertisement of Capt. Wm. Currie, A. Q. M., for hay, oats, and corn, bearing date St. Louis, Mo., Dec. 29, ?64, provided the contracts are awarded.
We also certify on honor that we have already purchased the amount specified.
Signatures. Hay, tons. Bushels, Bushels, corn. Place of delivery.
A. K. Horfclirup. 75, 000
W. T. Scliew &Co.... 122,000 50, 000
Judd & Co. 200 15, 000 Corn, Cairo; hay, St. Louis.
Cobb, Blaisdal & Co... 100,0.00 50, 000
E. O. Stanard & Co... 35, 000 Cairo and St. Louis.
Fowler & "Wicker. 25, 000 Cairo.
C. C. Thompson. 20, 000 10, 000 Oats for St. Louis j corn do. orCairo.
Holán & Caffrey. 5, 000 10, 000 St. Louis.
Sells & Co. 10, 000 10, 000 St. Louis.
H. A. Homeyer & Co . 7,000 35, 000 St. Louis.
Fenby & Co. 50, 000 25, 000 Bo., or Cairo.
Alex. Kelsey — -. , 20, 000 Cairo.
J. Bindley. 300 St. Louis.
John B. Valle & Co ‘... 50, 000 Cairo.
-JohnM. Mahan.. 10,000 St. Louis.
Harmon & Winston... 25,000 Cairo & St. Louis.
J. M. Eichards. 15, 000 Cairo.
Colonel Myers informed Captain Currie that the facilities at that season of the year were very much, curtailed by the closing of the upper risers and a reduced amount of supplies, and, in consequence of what they both supposed were the necessities of the case, Currie, liy instruction of Colonel Myers, at the same conference made a further verbal contract with the claimants, and the other parties present at the conference, respectively and severally, for all the grain they could deliver during the emergency. It does not appear that any contemporaneous memorandum of the terms of this agreement was made; nor does it appear to the satisfaction of the court what those terms were; and it appears that the several parties who were *535 present at the conference and entered into the identical several agreements are not agreed as to its terms.
John B. Vail, who was present and took part in the conference, and who agreed to deliver and did deliver hay under the several identical agreements referred to in this finding, had also a written contract for the delivery of hay, and understood the verbal contract to he that he should deliver any additional quantity of hay not included iu the written contract, and receive the price mentioned' in the written agreement, and should continue to deliver until he should receive notice that the defendants did not wish any more.
A. K. Northrup, who was also, present at said conference and agreed to deliver the 75,000 bushels of oats opposite his name on the memorandum, understood that the contractors were to go ahead and the Government would take all they could buy,4but he did not understand that Captain Currie told them so; and he did not furnish any oats under the contract, not even the 75,000 bushels referred to iu the memorandum.
Currie understood the agreement to be that he would on behalf of the defendants receive the hay and grain from the various contractors at the depot at Cairo, Ill., in indefinite amounts and until notice to stop delivering should he given, and' at the rate of 98.2 cents per bushel for all the oats so delivered, and that the contractors were to supply all they could during the emergency, but that they were not obliged to furnish all the ■Government might require unless they were able to do it, and the Government was not obliged to take more than it required, and that the contract was .that contractors were to deliver immediately, that is, as fast as it could be delivered, a certain amount of forage and as much more as possible until the emergency had passed, and that the amount which the Government was bound to receive was limited by its necessities.
The proceedings which the claimants took subsequent to January 5, 1865, is the only evidence of their -understanding of this contract.
Now, it is to be observed in the first place that here are two independent transactions: 1st. The agreement on the part of the claimants to deliver 100,000 bushels, and of other parties to deliver 389,000 bushels of oats within twenty days. This agreement was made in response to General Allen’s telegram to make heavy shipments to Cairo, and asking how much could be sent within the next ten days. 2d. An agreement made not by the direction of General Allen, but by direction of Colonel Myers, in consequence of the supposed necessities of the case, with the claimants and others touching an amount not fixed.
That the second agreement was understood differently by the parties is found as a fact; and the fact is a fresh proof of the wisdom of Congress in forbidding the making of verbal contracts. The fact has also this further significrnce in law— that no contracts, even if permitted by law, could have been made between the two parties, except so far as their minds *536 met together. It is reasonably clear from the findings that the minds of the parties never met upon the part of the alleged contract, which is absolutely essential to the claimants’ case, viz, that Currie gave the claimants a roving commission to purchase grain, agreeing to take oft their hands everything they could buy, whether delivered before the expiration of the emergency or not. There are circumstances in the findings which tend to show that the claimants so understood the agreement. There is no doubt that Currie and some of the other parties who entered into a like contract at the same time did not so understand it, and as Currie’s mind and the claimants’ mind never met on this point, there was in law no such contract.
5. Admitting, however, the contract to have been what the claimants contend it was, there was no law authorizing it.
- The Act of July 4, 1864, reorganized the Quartermaster’s Department, and created within it a fifth division, which was to- “ have charge of the purchase, procurement, issue, and disposition of forage and straw for the Army.” Bach word is carefully chosen. “Purchase” covers the contracting; “procuring,” the obtaining and taking into possession; “ issue,” the giving out for use; and “ disposition,’’.the care and custody. Each is a personal trust imposed by statute upon a military officer, and not to be delegated to civilians.
In the general statues regulating contracts there is no indication of a willingness to sanction contracts like that now set up.
The universal practice of the Departments equally fails to furnish precedents for it. Contracts with the Government ifiva-riably specify time and place of delivery, and furnish some measure for the amount to be delivered. We know of no law or no custom which ever authorized a purchasing agent of the Government to clothe a contractor with a roving commission and to agree to take off his hands all he can buy.
6. The claimants’ demand is for their losses on the sales of the grain thrown upon their hands. The evidence of the actual sales is an essential part of the proof of those losses. Such evidence is not furnished. Their case is open to so many objections before reaching this question that we do not think it necessary to consider whether we should be justified in giving judgment against the defendants on the general facts as to average prices set forth in the findings.
The judgment of the court is that the claimants’ petition be dismissed.