OPINION.
Davis, J.,
delivered the opinion of the court:
This controversy began in a common-law suit in this court, tried in 1872 — Harvey & Livesey v. The United States (8 C. Cls. R., 501). After -that judgment was. paid, Congress conferred upon this court special equity jurisdiction to enable it to give *476 tbe claimants further relief. The suit in equity under that enabling act was first heard on demurrer as to the extent of the relief which the court should give in the new process. (Same v. Same, 12 C. Cls. R., 141.) When this was settled, the case was heard on the merits on the identical proof présented in the common-law suit. (Same v. Same, 13 C. Cls. R., 322.) The Supreme Court sustained the rulings of this court on the demurrer, but reversed the rulings on the merits. (Same v. Same, 105 U. S. R., 671.) The case now comes to ns to have the will of the Supreme Court executed.
I. The controversy grows out of a contract by the claimants to construct the piers and abutments of a bridge to connect Bock Island with Davenport. The first contention related to the evidence of the contract. The claimants contended that there was a material variation to their injury, between the bids and proposals on the one hand and the written contract on the other; that the variation was caused by mutual mistake, and that the court should resort to the bids and proposals for the true evidence of the contract.
This court was unanimous at the common-law trial that it could not look behind the written contract to ascertain the intent of the parties. At the hearing in equity three judges were of opinion that the evidence did not show the mutual mistake which is necessary to enable a court of equity to reform a written agreement. The fourth judge did not concur in this result, and the Supreme Court sustains him. It says:
The written bid, in connection with the advertisement, and the acceptance of that hid, constituted the contract between the parties, so.far as regards the question whether the contract prices embraced the coffer-dam work. (Garfielde v. United States, 93 U. S. R., 242; Equitable Insurance Co. v. Hearne, 20 Wall., 494.) The written contract, in that respect, was intended by both parties to be merely a reduction to form of the statement as to work and prices contained in the bid. * * * We are of opinion that by the actual contract between the parties the appellants were not to do any of the work covered by the claim made by them under item 1 of the petition herein, and that the written contract must be reformed accordingly.
This mandate of the Supreme Court is obeyed in the judgment about to be entered. It is proper before ordering it to call attention to the fact that this suit is in equity; so that the action of the court under its extraordinary special powers is not to be cited as authority in common-law suits.
The claimants’ contract was made with the War Department. *477 It came within the provisions of, the Act of June 2, 1862, requiring all contracts with the War, Navy, and Interior Departments to be reduced to writing and signed by the contracting parties with their names at the end. thereof. In the suit at common law we regarded the contract which complied with the provisions of this act as the only contract between the parties. ■ When Congress, however, conferred upon the court the power of reforming this contract, it waived the rigid requirements of the Act of 1862. It authorized us to go behind evidence which that act makes conclusive, and ascertain the agreement of the parties from the proof contained in the bid and proposals.
In the recent case of the South Boston Iron Company (ante, 165), Judge Scofield, for the court, carefully considered the section of the Revised Statutes which codifies this part of the Act of 1862. He said that we regard the provision requiring both parties to sign at the end of the contract as mandatory. Unless an instrument purporting to be a'contract with the War, Navy,, or Interior Department complies with the mandate, or unless Congress waives the requirements of the statute, the instrument can have no validity against the United States in a court, except as evidence of the worth of services or labor actually performed or rendered under it. The court may treat the contract, when signed in conformity with, the provisions of the statute, as relating back, when necessary to protect other interests, as in Adams’s Case (1 C. Cls. R., 192); or when work has been done under it before signing, as in Powers’s Case (ante, 263) and in Shipman v. The District of Columbia (ante, 291), both decided at "the present term; but this does not modify the general rule which requires it to accept as evidence of such a contract only the instrument reduced to writing, in conformity with the provisions of the statute.
II. The next contention related to the cost of the coffer-dams necessary to enable the workmen to construct the piers. On this point the Supreme Court says:
In regard to tie coffer- dams it seems clear to ns that tlie ruling of tire Court of Claims was erroneous. The advertisement begins by inviting proposals for the construction of the piers and abutments of the bridge. Standing . alone this would involve proposals to make coffer-dams and do and furnish everything else necessary to finished work. But this is qualified by what follows. The advertisement goes oñ to say that parties making bids will state (1) the price per cubic yard of solid masonry at which they are willing to complete the work, the'United States furnishing the stone, *478 cement, and sand, “ and nothing more.” “To complete the work” there means to construct the piers and abutments complete, including the making of coffer-dams. * * * Then parties making bids are also to make a hid stating (2) separately the price per cubic yard' of solid masonry at which they will undertake to build the piers and abutments, the United States furnishing stone, cement, and sand; and also to make a bid stating (3) separately the price at which they will agree to put in the necessary coffer-dams with their protections. * * * The appellants did not make a hid for the work complete, or say in their bid that thejT were willing to complete the work. They bid only under bid 2. * * * They excluded bid 3 and the coffer-dams, and they excluded bid 1 and the cofferdams in it. This is quite enough to determine the question. The written bid in connection with the advertisement, and the acceptance of that bid, constituted the contract. * * *
Under this ruling we must determine what the claimants did in constructing coffer-dams, and in pumping the water from the space inclosed in them, and in excavations for the preparation of the bed for the masonry. We understand the Supreme Court to hold that the contract related to the masonry only.
There were ten coffer-dams in all. . It was necessary to pump the water out and to keep it pumped out from the space walled in by each. The shale, gravel, and mud above the solid rock had to be excavated in order to prepare beds for the masonry. The piers were in different depths of water, varying from of a foot at low water on the Iowa side to 20^0- feet at low water at pier No.-5.
The amount of excavation to be made after reaching the river bed varied also. At the Davenport abutment there were from to 2 feet of earth, gravel, and loose rock. At pier No. 1 there was nothing. At pier No. 2 there were from 3£ to 4 feet of gravel. At pier No. 3 there was no excavation. At pier No. 4 there were 3 feet of gravel at the upper end, and only 6 inches at the lower. At pier 5 there were 6 or 7 feet of gravel. At the upper rest there was about a foot of gravel on the Iowa side and none on the island side. At the pivot-pier there was no gravel. At the lower rest no excavation was necessary. At the island abutment there was a rock excavation of 5 feet for which the claimants were paid as extra work.
From these causes the cost of constructing coffer-dams and of doing the necessary pumping and excavation must have been much greater at some piers than at others. It is impossible that the dams, or the pumping, or the excavation could either of them have been subject to a general rule of relation to the cost of the masonry in a pier.
*479 The defendants constructed 'the coffer-dam for piers 3 and 5, and completed coffer-dam No. 2, built the inside dam of pier No. 4, and built two-thirds of the .coffer-dams for the upper rest for the draw. The claimants constructed the remainder.
The defendants did the pumping at piers 2, 3, 4, and 5, and at the upper rest. The claimants did similar work at the remainder of the piers and at the. abutments.
The only excavation done by the claimants was at the upper rest and the island abutment. The claimants prepared the bed for the masonry at the Davenport abutment, at pier 1, at the three piers at the draw, and-'at the Iowa abutments; the defendants did the remainder of this work.
The burden of proving the worth of labor preformed and services rendered is always on the party seeking to recover it. In this case there are special reasons why the claimants should bear that burden.
It is now settled by the decision of the Supreme Court that when the contract was made both parties understood that the United States were to make the .-coffer-dams. But unless we are to discredit Army officers óf rank and high character, it also seems reasonably clear that up to two or three days before the 13th of September, 1869, the local' agents of the Government at Bock Island and the Bureau.of Engineers had not been informed of this construction of the contract, and understood it otherwise. On that day the claimants wrote to General Warren:
We hereby request that the United States shall forthwith construct the requisite coffer-dams, exhaust the water therefrom, and prepare the bed for said piers and abutments when necessary for the commencement of the work.
Two days-later they filed with' General Warren a protest, in which they said:
We do hereby protest against such refusal of the United States to build said dams, and pump the water therefrom,'arid prepare said beds, and do hereby notify the United States that we shall proceed at once to build said dams, pump the water therefrom, and- prepare said beds, and shall hold the United States for the payment1 of the cost arid expense of the same.
ÍTo this protest General Warren replied:
In order not to delay the work I consent to the work going on until the matter can be referred to the United States Attorney-General, but in this consent it must be considered that nothing is admitted in favor of the claim of the contractors to their interpretation of the contract.
*480 It does not appear that the opinion of the Attorney-General was ever taken by the War Department. General Warren wrote as follows to General Rodman:
As you were tlie officer wlio executed the contract ou the part of the United States, will you please inform me if there was anything implied in any way which justifies the protest made by Messrs. Harvey & Livesey. It seems to me clear that they having made all the preparation for putting in the coffer-dams, and only entering their protest against doing so just as they were going at the work, shows that this is an afterthought of theirs, and not only not according to the wording of the contract, but not according to their own understanding of it at the time it was made.
To this General Rodman replied:
My understanding of the contract at the time it was signed was that Messrs. Harvey & Livesey were to put in the coffer-dams, prej>are foundations, and do and furnish everything except the stone, sand, and cement necessary to the completion of the piers and abutments, and I was then and am now fully impressed with the belief that they so understood it.
The opinion of Major Edson, who drafted the advertisements and drew the written contract, was also obtained to precisely the same effect. The papers were then referred to the Judge-Advocate-General, who replied:
Upon the «contract and statements of Generals Warren and Rodman, I can come to no other opinion than that which they have arrived at in regard to the obligation of the contractors to build the coffer-dams, pump them out, &c., as incident to the erection of the piers and abutments.' * * * Any claim which they may hereafter make for damages or additional compensation on account of being required to perform the work against which they have protested can be mot and properly defended when formally presented or prosecuted.
This opinion was communicated to General Warren, with a letter, in which it was said:
The Secretary of War approves your action in permitting the contractors to go on with the construction of the piers after they had protested against your decision and action in relation to the coffer-dams, &e.; but that protest will not be recognized by you in any way as a condition under which the contractors continue work; nor is it to be considered as forming any agreement or understanding between yourself and them, nor as having been assented to in any manner or degree on the part of the United States.
The substance of this was communicated to the claimants, and down to the day when the work was taken from them by the United States they did work on the coffer-dams and in preparation of beds for the masonry with knowledge that their claim for compensation for it would be disputed and could only *481 recognized at tbe end of'a lawsuit. We are of opinion that under the circumstances, if they intended to demand payment from the United States “of the cost and expenses of the same,” to use the language of their protest, it was their duty to keep accurate accounts of the same and produce them here. The details and amount of those costs and expanses were facts within their knowledge and control, ancjnot within the knowledge and control of the United States. :
presenting such detailed statements the claimants rely upon, the opinions of exper'ts. Some of these experts give their opinions generally that it would cost as much to build the coffer-dams as to construct the masonry within them. We have already sepn that from the nature of the work such opinions have no value whatever.
The evidence of two other experts is offered by the claimants.
one a engineer, who . made estimates of the cost of coffer-dams with reference to a bill for this indentical work. His opinions are founded upon drawings made by a civil engineer in the defendants’ employ at that time, without knowledge of the actual work doné, and his. estímate is $15 a running foot.
The other is a civil engineer, apparently of considerable experience, who estimates from the same «plans, and who occasionally saw the work, but without givingut particular attention. If facts and figures which undoubtedly were within the knowledge and control of the claimants, and -which in our opinion are still within them, can be proved by. expert testimony, then this witness’s evidence is entitled to the weight which belongs to the opinions of a person in the same line of business as the claimants, and evidently biased in théir favor; and the evidence of the other witness is entitled to the weight to be attached to such a jumping conclusion. - '
But in our opinion the cost of these coffer-dams and the work connected with them is a fact to be proved by evidence of the items which go to make it up, and not by the opinions of any man as to its worth, however learned he may be in his craft. In a controversy as to such cost, where, neither party has access to the items which actually went into it, the evidence of experts might possibly be admissible. But in á case where one of the parties has control of these items, and especially wnere ne has *482 been notified in advance that he will be expected to prove them, and has undertaken to do so, we cannot admit such proof.
The logical result of the claimants’ requisite proof would have been the dismissal of their petition as to this part of their case if the defendants had not supplied the defect. The defendants’ testimony on this point is also open to the objection that it is in the nature of expert testimony; but we think that, being offered by the defense, it is competent for the claimants to use it and have the benefit of it. It is, too, evidence of a higher character and more trustworthy than that offered by the claimants. One of the witnesses is the officer of the Army who superintended the work during the whole period; who saw the claimants construct their coffer-dams, make their excavations, and prepare the beds for their masonry; who did the same work for the United States after the work was taken from the claimants, and who audited the bills for the work done by the Government. The other is a civil engineer who was in the employ of the Government on this work during the whole period, and who made the plans upon which the claimants’ experts founded their opinions. Their testimony relates to the cost of the dams, the pumping, the excavations, and the beds for masonry, each separately.
Coffer-dams. Scott’s and Captain Stickney’s estimates for the coffer-dams are as follows; but Scott includes the cribs and breakwaters, while Stickney does not, butmaks a separate estimate for them at $4,000 for all: .
Davenport abutmen .. — . $781 18 $781 18
Pier No. 1. 1,446 31 1,614 02
Pier No. 2. 2,363 83 1,614 02
Pier No. 4 . 3,933 28 2,987 63
Upper rest.-.. 3,107 92 2,294-92
Pivot. 2,187 92 1,762 16
Lower rest. 2,081 73 1,619 07
Island abutment. 1,348 17 1,241 40
Add to Captain Stickney’s estimate seven-tenths of $4,000, the cost of the cribs, &e., the United States having furnished the other three-tenths in the three dams built by them. 2,800 00
17, 250 34 16, 001 02
*483 average their two estimates is $16,625.68. But from this should be deducted the worth of the work done by the defendants on the coffer-dams. , We have semi that they did some work on the dams for piers 2 and 4. We have no means of knowing how much it was, and, therefore, we dismiss it. On the dam for the upper rest they did two-thirds of the work. Deducting this amount we have—
Average of the estimates for the whole__. $16,625 68
average of the dam for upper rest. .1,934 28
Cost of work done by claimants on coffer-dams-. 14,691 40

Pumping.

abutment.$198 00
Pier 1..,. 172 50
Pivot-pier..<.. 232 50
Lower rest. 165 00
Island abutment..1. 195 00
-. 963 00

Excavations.

Upper rest. 77 55
Island abutment. 220 00
- 297 55

Preparation for masonry.

abutment.....„•. 69 00
Pier 1..._ 46 00
Upper rest.i... 92 00
Pivot-pier.■. 46 00
Lower rest.-. 23 00
Island abutment.. 23 00
299 00
16,250 95
represents all that the claimants are entitled to recover on this branch of their case under the mandate.
next contention was as to a supposed loss of profit to the claimants by reason of a change in the shape of the piers. At the argument it was stated that this claim related only to the piers, not to the abutments. The claimants contend that the plans referred to in the proposals, and upon which they based their bid, and which, under the decision of the Supreme Court, were a part of their contract, contemplated larger piers than those which were actually constructed. They say that *484 their bid was founded upon a cut-stone masonry and the amount of coarse masonry, which was changed to their disadvantage in the new plans. The reduction of the whole amount of masonry caused by narrowing the piers took effect, they say, in the coarse masonry in the interior, leaving the dressed surface substantially the same in both plans.
The court has no satisfactory way Eodman’s plans were, or how far they were examined by the claimants. We can find out, however, what amount of masonry the claimants expected to construct when they entered into their contract. The proposals estimated the total amount at about 10,000 cubic yards. The bid was in response to these proposals, and both proposals and bid form part of the reformed contract. And as late as September, 1870, the claimants wrote that when they contracted they supposed the amount of masonry to be done was about 10,000 cubic yards.
The actual amount in the work as constructed was 8,594^ cubic yards, or, to adopt the more vague language of the proposals, about 8,600 cubic yards.
' It thus appears that the extreme limit of a demand under this head would be for 1,400 cubic yards; and as the agreed profits for interior masonry was $8.63 per cubic yard, there would be due the claimants, on the assumption that all the masonry abandoned in the new plan was interior masonry, and that they were entitled to recover their profit on the whole amount of the diminution, the sum of $12,110.
But the claimants had completed only about half the masonry — in fact a little less than half. We think they should in any event only receive this allowance on the part completed by them. The amount of $12,110 should therefore be reduced at least to $6,055.
But this is subject to a still further reduction. The work consisted of abutments and piers. The claimants make no demand for reduction in the abutments. More than half of the work done by the claimants was in abutments. This again reduces the item of $6,055 down to at least $3,027.50 on the theory most favorable to the claimants.
All this, however, depends upon vague methods of calculation, which a court should not adopt if better and more precise methods can be discovered.
*485 We have, in General Warren’s testimony, the means for estimating these amounts exactly. General Warren succeeded General Rodman in charge of the work. He was the officer who revised General Rodman’s plans and made the new plans. He was well acquainted with both plans. He says:
Taking {lie whole draw-pier at my location, his [General Kodman’s] pier contained 568 more cubic yards than mine. * * * Estimating them to stand on an average in 6 feet ofwa^er, hih plans contained 3,338 cubicyards for all five piers. My quantity was 3,285 cubic yards.
The “whole draw-pier” and “the five piers” cover all the work on which the present claim is made. In the draw-pier the diminution was 568 cubic yards; in all the other piers, 53 cubic yards; in all, 621 cubic yards. At $8.65 per cubic yard this amounts to $5,371.65.
This is the amount which the claimants would have been entitled to receive under the ruling of the Supreme Court had they constructed the whole of the piers.
But they did not construct the whole. The deposition of Harris, taken by the claimants, shows what had been done. He says:
Being interrogated by E. H. Harvey, for the claimants, the witness says: Interrogatory. Did you work for Harvey & Livesey in the construction of the Kock Island Bridge up to the time the Government took charge?
Answer. I did.
Interrogatory. Please state the position of the work at that time — of the several piers and abutments.
Answer. The Iowa land abutment^the foundation, was laid up, and one course of cut stone laid on it, with the exception of two little stones. The Iowa shore abutment was finished. Pier No. 1' was finished. Pier No. 2, the coffer-dam was built, pumped out, the traveler was up, and the jenny was ready for hoisting the stone, and a boat-load of stone was there. Pier No. 3, nothing had been done. Pier No. 4, the dam was built ready for pumping out, with one side of the traveler frame up. Pier No. 5 — couldn’t state anything further than that the cribs were put in and the breakwater on it. The pivot-pier was complete. The lower rest was complete. The upper rest, some stone was laid in it, and part fif the dam was built; one course of stone was laid half around, and about one quarter of another course. The island shore abutment was complete. The island land abutment was complete, all except the coping; that is, as it could he completed for the want of coping.
Interrogatory. Are the plans produced by you,correct representations of the state of the work you have just described?
Answer. Of the masonry part of the work they are; the breakwaters of Pier No. 1 are finished, hut not in the plan. Nos. 2 and 4 and the upper *486 rests are completed, but omitted in the pian. In every other respect I believe tbe plan to be a correct representation of tbe state of tbe work of tbe bridge at tbe time tbe Government took charge of tbe work, and sucb plan, marked Exhibit “B,” “ C,” and “ D,” as signed by me and tbe commissioner, I wish to be attached to this my deposition; and sucb plans, marked “Exhibit B,” “Exhibit C,” and “Exhibit D,” and attached to my deposition, I wish to form a part of this my deposition. What I mean is, that there are three cribs instead of two (2) cribs, as shown on the plans, and planked across from crib to crib to complete the breakwater.
Interrogatory. Do you mean to include the preparation of stone for the masonry to pier No. 2 and No. 4, the upper rest and No. 3 pier, and No. 5, as delineated on the plan?
Answer. I do not include that; the masonry was not done in those piers.
It appears from this that tlie claimants did a large part of tbe work in tbe abutments and finished pier No. 1; that piers 2, 3, 4, and 5 were substantially constructed by tbe United States; that the pivot-pier and tbe lower rest were constructed by tbe claimants, and that tbe upper rest was substantially constructed by tbe United States. Tbe diminution from Rod-man’s plans in tbe piers that were constructed by tbe claimants as follows, was, as shown by Warren’s testimony:
Pivot of the draw.•.. 76 cubic yards.
Lower starting. 271 cubic yards.
Pier 1, \ of 53. 7.5 cubic yards.
354.5 cubic yards.
Which, at $8.65, would amount to $3,066.42. This is remarkably near, tbe amount reached by tbe other method or calculation.
We find, then, tbe sum to which tbe claimants would be entitled, if they are entitled to recover anything, in consequence of tbe reduction in the piers, to be $3,066.42.
But there is a serious reason why the claimants should recover nothing on this account. The findings of fact of this court in the common-law suit contained the following:
As to the fifth item of said demand, as amended, the court finds that the claimants, before their ejectment from said work by the orders emanating from the Department of War, had done work upon and for said bridge under said contract to the amount of seventy-six thousand three hundred and forty-four dollars and forty-seven cents, the particulars of which are as follows:
Stone set in draw-pier, 1,556-J- cubic yards, at $13 per yard.|20,234 50
Stone set in other piers, 2,599 cubic yards, at fll per yard. 28,589 00
Stone dressed, not set, 1,527 cubic yards, at $11 per yard, less
$2.63 per yard, which it would have cost to set it. 12,781 00
*487 Stone received and handled, not set, and ready- as backing to the 1,527 yards of the next preceding item, an equal quantity, viz, 1,527 cubic yards, at'$11 per yard', less $2, which it would have cost to/set it.....$13,743 00
The last two allowances are for stone which,the claimants had on hand, and which the United States subsequently put into the work. As the claimants received, the full contract price less the estimated cost of setting it, it is plain that they received their full profit on the work as finished work. It was stated in the argument, and was not controverted, that there was no profit in the dressed stone. There remains, then, the undressed stone for backing, on which it is conceded that the profit was $8.65 a cubic yard; or in all—
1,527 cubic yards @ $8.65 ...$13,208 55 which has been already paid to the claimants.
On turning to the opinion of the court in the common-law suit we find the following:
The record shows no ground of forfeiture, or reasonable apology for ejecting the claimants from the work. The act was unauthorized, and constituted another breach of the contract, for which the law awards at least nominal damages. But the evidence fails to show actual damages, and therefore we have allowed none; on the contrary, the cost of finishing the work would have been, as shown by the proof, equal to the price to be paid for it.
It would appear then that the court, while deciding that the evidence failed to show damage, did actually award damages to a large amount. •
The claimants attempt to explain this by referring to the terms of the unreformed contract, one of which was as follows:
It is further stipulated and agreed that if any default shall be made by the parties of the first .part in the performance, of their work specified in 'this contract, of the quality and at the times and places therein provided, that then, in that case, the United States shall have the right to take entire and exclusive charge of the work and to complete it in accordance with the conditions prescribed in this contract, charging us with the entire cost of completing it, and crediting us with the amount per cubic yard heretofore stipulated to be paid us for the completion of the work.
They say that this finding is only the carrying out of this provision of the contract; that the court did actually charge the claimants with the entire cost of setting this stone, viz, $2 per cubic foot, and did actually credit them with the amount *488 per cubic yard by the contract stipulated to be paid them the work.
This argument would have greater force if the setting of those 1,527 cubic yards had been all that remained to be done on the work when it was taken from the claimants. But we know indisputably that the setting of those stones formed but a small part of the work which remained to be done in order to complete the piers and abutments, and that in point of fact the United States did spend a very large sum of money after that time; so large as to warrant the language of the court in its opinion that “the cost of finishing the work would have been, as shown by the proof, equal to the price to be paid for it.” It is true that this opinion was based upon the theory that the claimants were to construct the coffer-dams and make the excavations. But we have already seen that most of this work was done when the United States took possession, and that the' cost of what remained constituted but a small part of the large expense to which the Government was put after that time.
The truth is, and we cannot shut our eyes to it, that the opinion shows that this court when it entered that judgment in the common-law suit did not do what the contract called for; it did not state an account between the United States and the claimants, charging them with the entire cost of completing the work and crediting them with the contract price of it, but it allowed them their full profits on a certain portion of the work, without taking into consideration the losses which they might have suffered in doing the rest. If the record is carefully examined it will be found that this is all the court assumed to do. The fifth item in the bill of particulars was—
“For constructing 4,400 cubic yards of masonry, at, say, $12 per yard, $52,800.”
The court in the finding above cited finds that the claimants, had done work under the contract, “the particulars of which are as follows”: and among the particulars of the work done under the contract were the 1,527 cubic yards of stone which were never put into the wall by the claimants. The court did not regard this as work done by the United States, and the provision of the contract now invoked, which relates exclusively to work "done by the United States, has no bearing upon it.
If this allowance made to the claimants in the former judgment is not an allowance of profits on work not done by them, *489 we are unable to understand what such profits are; and if it is not tbe identical thing which the claimants are now seeking to recover, we are equally at fault.
It is worthy of remark, in this' connection, that the record contains a statement of account between the parties, in which the amount paid by the United States on the vouchers for completing the piers and abutments after they took possession of the work was $86,653.24. The account as balanced shows an indebtedness by the claimants to the Government of $33,681.35. Making every allowance which could possibly be claimed for the cost of the coffer-dams after the Government took possession, the state of this account would still completely negative the theory on which the claimants try to maintain the rightfulness of the former judgment. -
From this it appears that the claimants have already received some $13,000 as profits on masonry, not constructed by them. Being allowed and paid to them under a judgment of this court not appealed from and not reversed, it cannot be recovered back. But the court, sitting as a court of équity, is certainly entitled to take the fact into consideration when asked, under the mandate of the higher court, to award the claimants a further sum for the same thing.
IY. But oue item remains. The Supreme Court says:
The question of interest, under item 8, remains for that court [the Court of Claims] to consider.
We cannot but think that if the Supreme Court intended that we should allow interest on any sum that might be found justly due the claimants it would have directed us to allow it. We do not regard the suggestion thus thrown out at the close of this opinion as a direction to us to disregard the rule for our conduct in such eases carefully prescribed to us by that court in the case of Tilson v. The United States (100 U. S. R., 43), a ease which was sent to us under a special statute, as was this one. The court says:
We have no donbt it was the wish of those who procured the passage of the special statute under which, the Court of Claims took jurisdiction of this suit to obtain from Congress authority for that court to give a judgment against the United States at least for interest in case it should be found that payment on the contracts held by the claimant had been unreasonably delayed. But if Congress had desired to grant such authority it would have, been easy to have said so in express terms; and because it did not say so, we are led irresistibly to the conclusion that it did not intend to give any such power.
*490 Following this explicit direction, we disallow the claim for interest.
Y. It will appear from a candid recapitulation of the various results reached during this long litigation that the final allowances which we now make are substantially just as between the parties — certainly that they work no injury to the claimants.
In their suit at commpn law the claimants demanded damages for increase in the cost of the, work by reason of having-been compelled to do it in cold weather; for loss caused by the defendants’ neglect to furnish materials; for loss of machinery, vessels, and tools, and for extra work. The court found as fact that nothing was due them on these counts. These items, therefore, disappeared from the controversy as res judicata.
In the same suit they demanded payment for the work which they had actually done, and they were allowed payment in' full for all the completed masonry. They were also allowed; in payment for the stone which they had prepared for use but not inserted in the piers, not only the small sum which would have been due them for the preparation, but also their full contract profits upon the whole amount. These items, also, then became res judicata, and were no longer subj ects of controversy.
Iu the same suit they demanded damages for injuries caused by sundry alleged delays of the defendants which compelled them and their workmen and tools to remain idle. They were allowed a large compensation for these injuries. These disputes also were thus settled.
In the same suit they claimed pay for the cost of the cofferdams and compensation resulting from the diminution of the piers, but the court said that as a common-law court it could not entertain these claims, founded upon an alleged mistake" in the reduction of the contract to writing. It escaped the attention of the court at that time, and at both the hearings in equity, and it apparently escaped the attention of the higher court, that in the common-law suit this court did take jurisdiction over the claim for profits, and did allow them in full.
When our jurisdiction was enlarged the claimants renewed many claims which had been rejected in the old suit, and advanced néw claims for the profits which they alleged they had been deprived of; but all the claims which had been adjudicated and all which might have been adjudicated at common *491 law were ruled out on demurrer^ and the ruling was sustained above.
The claimants also renewed in equity their claims for the cost of the coffer-dams, and foNdamage caused by diminution of the piers, and advanced a new claim for interest. For reasons set forth in this opinion, we disallow two of these claims and allow the third as far as proved.
The result of all this litigation is this: The United States have paid and will pay for this work', excluding all sums paid for special damages and injury
To the claimants.:.%. $76,344 47
To sundry persons on vouchers after taking possession of the work... 86,653 24
The judgment in this suit. 16,250 95
179, 258 66
On the claimants’ theory as to the coffer-dams and on their valuation of them the United States should have paid—
Contract price of the work. $100,666 65
Cost of coffer-dams in dispute, alleged by the claimants to have beeu constructed by them...$75,000 00
Cost of- coffer-dams actually constructed by the United States.:. 6,689 37
- 81,689 37
182,356 02
This justifies the opinion already expressed that our decision, reached by the application of sound principles of law to the evidence, works substantial justice.
YI. At the close of its opinion the Supreme Court says that — '
The rule in regard to findings of fact Has no reference to a case like the present, to equity jurisdiction conferred in a special case by a special act; and in such case, where an appeal lies and is taken under section 707 of the Revised Statutes, this court must review the facts and the law as in other cases in equity appealed from other courts.
Under these instructions and the general rule of the Supreme Court respecting appeals from this court, we present the following a$ our findings of the ultimate facts in this case and as our conclusions of law.
*492 FINDINGS OE FACT.
I. That if the evidence in the record is admissible to prove the expense which the claimants were put to by reason of being-obliged to put in coffer-dams and protecting them and making-provisions for pumping the water therefrom, and for preparing the beds for the piers and abutments, then that expense amounted to $16,250.95.
II. That if the claimants are entitled to recover any sum in consequence of the reduction of the dimensions of the piers and abutments, they are enttiled to recover therefor the sum of $3,066.42. '
III. That if the claimants are entitled to interest on the amounts allowed, or the claims sued for, or any part thereof, then, having- in view the gradual reduction in the rate of interest, the court finds as a fact that the rate of interest to be allowed is four per cent.
CONCLUSIONS OF LAw.
I. That the claimants are not entitled to interest.
II. That the claimants are entitled to judgment for $16,250.95 on account of specification 1 in their petition.
III. That the claimants are not entitled to judgment on any other matters set forth in their petition, but as to all such the petition should be dismissed.
JUDGMENT.
The judgment of the court is as follows:
The court, on due consideration of the premises, doth order, adjudge, and decree that the written contract between the parties, dated June 1,1869, a copy of which is attached as Exhibit 0 to the original petition of the claimants in claimants’ suit No. 6284, filed in this court December 14, 1870, be reformed in manner as requested by the claimants in their petition in this suit, and be made to conform to the intention of the parties as shown in the advertisement for the proposals for bridge masonry, a copy of which is attached to the said original petition as “Exhibit A,” and the bid of the claimants, a copy of which is attached to the said original petition, marked “ Exhibit B.”
And it is further ordered, adjudged, and decreed that the *493 claimants have and recover of the defendants the sum of $16,250.95 for the labor done and materials furnished by the claimants in constructing coffer-dams, and in performing the work necessarily connected therewith, and preliminary to the masonry work for the piers and abutments referred to in their contract, the same being on account of specification 1 in their petition in this case.
And it is further ordered, adjudged, and decreed that as to all the other items of claim in their petition in this suit said petition be dismissed. •