Davis, J.,
delivered the opinion of the court :
This action grows out of a contract, made in June, 1881, with plaintiffs intestate by the engineer in charge of improvements upon the Ohio River, and which, it is urged, was afterwards so interpreted by the Government officer as to cause the contractor serious loss. The subject-matter of the contract was the construction of a dike at “ Puppy Creek Bar,” upon the Kentucky side of the Ohio River,between Owensboro, Ky., and Rockport, Ind.
The first ground of action may be thus stated: The dike was by the contract to be 3,000 feet long, and the substructure was to be entirely completed in the working season of the year 1881, the superstructure to be placed upon it during the season of 1882. In September, 1881, however, Major Merrill, the Government engineer in charge, suspended the work upon the dike for several days, when it was resumed in accordance with another order, which, however, limited the length of the substructure to 1,500 feet, thus reducing the length of the dike one-half. As a consequence of these orders plaintiff’s intestate was damaged.
*407 The second cause of action is based upon the allegation that the contract required brush to a large amount to be put into the dike, whereas after the work had been some time in progress, Major Merrill directed the contractor to put in much less brush per running foot and much more riprap stone, which he did, to his loss and damage.
As to the first alleged cause of action:
The specifications'(s. 1) provide that the dike shall be about 3,000 feet long; they provide (s. 4): “ It is the intention that the substructure shall be completed during the first season and that the superstructure shall be placed on it during the ensuing season after the substructure shall have had an opportunity to settle and to become solidified’ by sedimentary deposits; ” they provide that (s. 13) “ during the second season of work the incomplete dike will be capped by a continuous superstructure of timber crib work filled with riprap stone; ” and they provide (s. 36) “ it is expected that the work of getting out stone and timber for the dike will be begun immediately after the contract is signed, and that the actual construction of the dike will commence as soon as the river is at a favorable stage for work. The substructure of the dike must be completed by December 31, 1881, and the superstructure by December 31, 1882.”
The contract, of which these specifications became a part, contained this provision:
“ The said Jacob Clark shall commence work under this contract on or before the first day of August, eighteen hundred and eighty-one (1881), and shall complete the same on or before the thirty-first day of December, eighteen hundred and eighty-two.”
Therefore it most distinctly appears that the contractor was bound to complete the entire substructure, 3,000 feet in length, during the season of 1881, and to place the entire superstructure thereon during the season of 1882. Plaintiff’s intestate promptly and properly gathered his materials at the dike and was efficiently performing work upon the substructure when he was stopped by Bateman, the inspector in charge, in consequence of an order from Major Merrill. After the lapse of several days work was again resumed under Major Merrill’s orders, but with the substantial difference that the substructure was ordered by him to stop at 1,500 feet; that is, the amount of *408 Vork which the contractor was obliged by the contract to be (prepared to finish in 1881 (and which he was prepared to finish) was reduced one-half.
As a consequence of the temporary suspension the contractor incurred various expenses, and his personal services and presence were required at the dike in the uncertainty of the situation. The losses which the contractor unavoidably and necessarily incurred during said suspension, through the order of the Government agents and by no fault of his, amounted to $812, and this amount plaintiff should recover from defendants.
Plaintiff should also recover, at the contract price, the value of the brush put into the work by the contractor during the suspension. The Government had the benefit of this work, and there is no reason why it should not have been paid for. He should receive upon this account (at the contract price) the sum of $1,593.90.
The piling and waling for 3,000 feet of substructure were at the dike at the time Major Merrill’s orders were given, as herein-above referred to. ' This was proper, and although due care was taken of the materials and they were removed out of the reach of ordinary floods, the extraordinary freshets of the winter of 1881-1882 washed away much of this property and it was lost to the contractor. But for defendants’ action this timber would have been securely in the dike at the close of the season of 1881, and Clark’s losses thereon should be paid.
The contractor’s misfortunes did not stop here. Had he been allowed in 1881 to finish the substructure as provided in the contract, he could have finished the superstructure in 1882; but in 1882 he was obliged not only to build the entire superstructure, but also to finish the substructure. That is, in 1882, through no fault of his, he was forced to build 1,500 feet of substructure in addition to the work which he had contracted to do in that season. This he could not do, therefore hia contract was extended by defendants another season. But in the ensuing winter (1882-1883) another freshet washed away his timber, without fault upon his part, as he had exercised due care in its protection, and he sustained various other losses detailed in the findings. The case is one of hardship, caused by no fault on the contractor’s side, but by the defendants’ agents, who were forced to this action by lack of funds in the autumn of 1881.
*409 The whole case (so far as these issues are concerned) is traceable in fact to the order cutting down the amount of substructure to be built in 1881 one-half from the contract requirement. As a result of that order material properly ready at the site in 1881 was lost; as a result of it the superstructure could not be completed in 1882 ; as a result of it plaintiff’s contract was extended into 1883; and as a result of it his material was again washed away in.the winter of 3882-’83. While this is so in-fact, defendants urge that in law they are not financially responsible for the contractor’s losses.
The contract (of which the.specifications are part) clearly shows that time was of its essence; the date of beginning work was fixed; the date of finishing the substructure was fixed; the date of finishing the superstructure was fixed; the intention was explicitly stated to finish the substructure the first season, that it might settle and solidify, to be in readiness for the superstructure in the second season; the work of getting out timber and stone it was “ expected” should be begun immediately ; the Government reserved the right to require an increase of force, and, failing tp secure this, to complete the dike themselves; and there was a forfeiture provision, to be operative should the contractor delay or fail to commence the delivery of materials or the performance of the work on the day specified, or should he fail to prosecute it in accordance with the requirements of the contract. Nothing but “ freshets, ice, or other force or violence of the elements” could (according to the contract) excuse a failure by the contractor to finish the dike within the specified time; therefore the contractor had a right to finish within that time. The subject-matter of the contract also was such that its terms must be fulfilled at certain times and at certain stages of the river.
Under such conditions as these the contractor very properly prepares his materials ready at hand for prompt delivery into the dike. Energetically prosecuting his work, he is told to stop when halfway through, and when quite able to perform his share of the contract obligation. In addition to this, it is claimed (a subject we shall consider later) that the contractor was cut off by the same order from a very considerable profit upon brush, which by the contract he should have been permitted to put into the dike in much larger quantity than Major Merrill thereafter permitted. Such being the situation, urge *410 defendants, the contractor had his option “to stand upon his old contract and bring his action for damages for its violation, or tp go on and construct the dike under the new. He chose the latter, and in doing so cast his lot with it.”
It will be noted that the position of the contractor has been entirely open ; at the time of the order he protested to Bate-man, the inspector, and notified him he should hold the Government responsible. This inspector was the Government officer empowered to inspect and measure all material, to have immediate oversight of the work, to give it his entire attention, and to see that it corresponded in every respect with the requirements of the specifications (specifications, s. 45). As soon thereafter as Clark saw Major Merrill he repeated to him this protest, and afterwards he declined to receive his retained percentage, fearing such action might impair his right to sue for damages. It would be a harsh application of a rule of law to hold that, being ready, able, and willing to proceed, the contractor should be forced to elect, in September, 188 L, after incurring considerable expense in preparing for the work, whether he would throw up the contract and trust to an'action for damages, or proceed with it, under the altered conditions, surrendering thereby any remedy for wrongs, real or supposed, caused by defendants’ action.
Such a ruling, while working hardship to the contractor, would often be of great disadvantage to the defendants •, it might well delay the erection of an important Government work, to the injury of the public and to the loss of the Government. Thus a simple difference of interpretation between a Government agent and a contractor, if held to cause rescission necessarily, might result in double payment by the Government, first to the discharged contractor for his damages should he be found to be right, second to the new contractor for the cost of the work. On the other hand, if the contractor promptly protests against the Government’s decision as unwarranted and illegal and notifies them of his intention to claim damages, thus putting the defendants on their guard, it would seem harsh to debar him of his rights because he continues the work with the Government’s assent under this interpretation. The Government could lose nothing by this course and might gain.
In Mosby’s Case (24 C. Cls. R., 1) a more liberal rule was applied ; there a difference existed between plaintiff and defend *411 ants as to certain moneys, for which, to avoid conflict, plaintiff accounted to the Treasury, not conceding the Government’s right to retain them, and the court held that—
“ Public officers (upon the question of their compensation and the payment of money into the Treasury) are not bound, in order to save their rights, to place themselves in antagonism to the accounting officers of the Department, suffer themselves to be sued, and incur the odium for the time of being in default; buthave the right to pay into the Treasury the disputed moneys, and then seek the courts to adjust and determine their claims against their superior and sovereign. * * * No person had been misled by the act of the party in the payment of the disputed fees. No interest of the Government has suffered by the acquiescence of the claimant for the time being in the construction by the Department of the law of consular service. No rights have become vested upon the faith of his acts, and no wrong can be done by the judicial investigation and determination of the issue presented by this record.”
This language was quoted with approval in the Supreme Court, that tribunal adding (133 U. S. R., p. 273):
“ The claimant acted with propriety, and with a high sense of honor, in paying thq fees into the Treasury in order to avoid a controversy with the Department; and he asserted his right to have the fees refunded to him, by making a demand that they should be credited to him in his accounts 'before such accounts were finally settled. He did not concede the right of the Government to retain the fees; and his action was equivalent to a formal protest made at the time of paying them over.”
The contractor herein was not a Government officer; he was not, technically, a subordinate; he did not hold a position from which he could be dismissed by an executive officer; and he did not have accounts in the Treasury upon which a credit could be made; but otherwise his position was similar to Mosby’s. He differed from defendants in the construction of one part of his contract; and immediately informed them of the fact, stating that he should expect compensation. The contract was confessedly infringed by defendants in another part. Against this Clark also immediately protested, but he proceeded with the work under the altered conditions, and did so energetically and competently, thus saving time certainly and possibly expense to the Government, which would have been forced to seek another contractor had Clark elected to consider the contract terminated.
*412 No person has been misled in this case, no interest of the Government has suffered by the acquiescence of the contractor {under protest and notice of future claim) in the construction given the contract by the engineer; “no rights have become vested upon the faith of his acts, and no wrong can be done by the judicial investigation and determination of the issue presented by this record.”
The contractor’s act- can not be considered an estoppel, for the Government has not been misled to its injury; on the contrary, it has been benefited by this conduct. (Ketchum v. Duncan, 96 U. S. R., 659).
Of course the contractor was under no obligation to abandon his contract because of Major Merrill’s order limiting the amount of substructure to be built in 1881; it may have been his privilege, but it was not his duty to do so. Rescission is a right of which the injured party may avail himself. In this case, whoever may have been correct in the controversy as to the amount of brush to go into the dike, there was no intent shown by either party to abandon the contract. At the most there was but a partial failure by the Government to perform its share, in that it limited the amount of brush and changed the stipulations as to the substructure. Possibly the case would therefore fall within the rule, that if the failure of consideration be partial, for which there may be compensation in damages, the contract is. not ended (2 Parson, 679; Franklin v. Miller, 4 A.& E., 599). It is, however, unnecessary to pursue this branch of the discussion further. If there were grounds to rescind the contract in 1881, then the plaintiff had the privilege — it was not his duty — to do so. He did not exercise this privilege.
Norwastherea change in the original contract; suchachange could not be made without compliance with certain formalities which were not observed; nor without the consent of the Secretary of War, which was not asked or given. It was not sought by anyone to change the contract; there was a difference in understanding as to what the contract meant as it existed at the time and continued to exist. Merrill understood it one way, Glark another. Merrill, having the power, prevailed; Clark submitted under protest and proceeded with the work, openly reserving his alleged right to damages arising from the erroneous construction. If Clark had assented to Merrill’s construe *413 tion he might now perhaps be estopped from claiming damages, bat he did not assent; lie protested and reserved his rights.' The point presented with force by the defense as to waiver of a written contract by parol we do not consider, for the facts show that there was no waiver in this case.
The action of September, 1881, did not constitute a new contract. Such a contract could only have been made (pursuant to the original contract) in writing, in which should be set forth fully the reasons for the change, giving clearly the quantities and prices of both material and labor substituted for those named in the original contract; and this new agreement required the assent of the Secretary of War. None of this took place. Further, such a contract required assent, and the contractor did not assent,but protested; and consideration, and the contractor received none.
The extension of the contract did not change the relations of the parties. It was an extension in time alone of the existing contract, which provided that an extension “shall in no manner affect the rights or obligations of the parties under this contract, but the same shall subsist, take effect, and be enforceable precisely as if the new date for such commencement or completion had been the date originally herein agreed upon.”
Defendants make the further point, that a protest is without effect when made against the performance of some act and followed by the performance of the act, where the person protesting knows or should know the legal effect of his performance (citing Georgetown College v. District of Columbia, 4 MacArthur, 43; Wilcox v. New York, 53 N. Y. Sup. Ct. R., 436; Sowles v. Soule, 59 Vt., 131; Oceanic Steam Navigation Company v. Tappen, 16 Blatch., C. C. R., 296). The cases cited all relate to the payment of public taxes or revenue, thus differing from the case at bar, where rights under a contract are sought to be enforced. In tax cases the citizen deals with the sovereign; in cases arising from contracts the citizen and the Government stand equal at this bar. (Bostwick v. United States, 94 U. S. R. 53).
The rule as to the payment of taxes is peculiar, and rests upon peculiar reasons, not found in the relations which arise from a contract, and no analogy can be drawn from the effect of protest against the collection of illegal taxes and a protest against an unwarranted course under a contract. Further, in *414 the cases cited the money had been paid; here the plaintiff seeks payment losses sustained and for work which he was not permitted to perform. (Cape Ann Granite Company v. The United States, 20 C. Cls. R., 1.)
Towards the close of the working season of 1882, the contractor being unable to finish the work because of the state of the water, the contract was extended, as its conditions provided it might be. While the water prevented completion of the work during the autumn of 1882, the contractor, nevertheless, would have been quite able during that season to have finished the superstructure, had the substructure been ready for it, as the contract provided.
When the season of 1882 opened the contractor was to be prepared to complete the whole work. It was necessary and proper for him to collect at the dike the material necessary to expeditiously finish the entire structure, as he must be ready to avail himself of any advantage presented by the shifting stages of the river. The gathering of the materials at the dike was not only a reasonable, it was a necessary, measure of precaution. There does not seem to be a valid distinction between outlays or preparations made when preparing to perform a contract whose complete execution is prevented by defendants, and the outlays or preparations made to complete a contract whose execution has been interrupted and delayed by defendants. If this be so, then the defendants should compensate the contractor for the actual and unavoidable losses he sustained during the winter of 1882-’83 and the expenses which he incurred during the working season of 1883, if those expenses were necessarily incident to the delay caused by defendants’ action; that is, if those expenses were of a kind which the contractor would not have incurred had the work been done as the contract provided and if they were necessary. It should be noted in this connection that the contractor was not allowed to begin the superstructure until late in October, 1882, although 1,500 feet of the substructure were ready for it in the spring.
Brush is not mentioned in the contract itself, but in the-specifications we find the approximate amount to be required stated as 6,000 cords. Further, it is set forth in the specifications that the substructure was to consist of two parallel rows of piling, with the interspace filled with layers of brush *415 weighted with stone (4); the shore end was to be protected either by crib work, a covering of brush and stone, or a combination of the two methods, as might be directed by the inspector (7); the piles were to be thirty feet apart (8), the space between them to be filled with alternate layers of brush and stone, scf that when the substructure was completed it would have a height of two feet above low water; the layers of brush to be placed alternately parallel with and at right angles to the rows of piles, and to be weighted down with a sufficient quantity of stone to keep it in place until the superstructure was built (11). The quality of the brush and the mode of measurement were also prescribed.
Defendants contend that the approximate estimate of amount of brush substantially governed the contract, and that about 6,000 cords, or two cords to the running foot, was all that was required. The importance of this question lies in the fact that Clarks bid was an “unbalanced” bid; that is, the price fixed for brush was high, while the price for other material was low, so that the contractor would derive considerable profit upon each cord of brush going into the work and little or no profit upon the rest of the material.
The value of these approximate estimates has been attacked, and it appears that the estimate in this case was made nine years before the contract; that such estimates are difficult to make, largely because the river scours as the work progresses and the estimates are necessarily inaccurate. It further appears, as to other approximate estimates made upon work in the Ohio River, that there were great differences between the approximation and the result.
Estimates for the Portland dike gave 682,800 feet, board measure, of timber (489,632 feet were actually used); 60,000 pounds of drift bolts and 1,200 pounds of spikes (35,810 pounds of bolts and spikes were actually used); 18,000 cubic yards of riprap stone (17,741 cubic yards were actually used); and 150 cords of brush (1,662 cords of brush were actually, used). The estimate for the Evansville Dike and extension called for 10,000 cords of brush, while 27,700 cords were used; the estimate for French Island Dike called for 5,400 cords of brush, while 18,622 cords were used; the estimate for the Henderson Dike called for 7,200 cords of brush, while 12,063 cords were used.
In the face of examples like these much trust can not be put *416 in tentative estimates. That this particular estimate was not regarded by the Government officers as very safe is shown by the provision in the specifications (3) stating that—
“ The maximum depth of water along the proposed line of the dike, as indicated by soundings made in 1872, was 6 feet in low water. A detailed map of Puppy Creek Ba$ as it was in 1872, with indicated position of dike, depth of water, and nature of bottom, can be seen at the office of the engineer in charge at Cincinnati. As the river bed is subject to change, bidders should visit the site of the work and satisfy themselves in regard to the conditions now prevailing.”
The engineer, therefore, was without late information as to the river bed, disclaimed responsibility for the present accuracy of the map, and threw bidders upon their own responsibility as to the then existing state of the river. We can not under those circumstances give much force to this approximation as to the amount of brush to be required. Major Merrill did not consider himself bound by it in this case, for by his order of September, 1881, he actually increased the amount of brush one-half over the 6,000 cords, and he finally allowed 13,663 cords to go into the dike.
Plaintiff relies principally upon two points in support of the contractor’s understanding of the contract. First, section 12 of the specifications, which provides: “ For further information as to the style of work intended for the substructure bidders are requested to examine the dikes at French Island, Evansville, and Henderson;” and, second, upon the working drawings with which he and the inspector were furnished.
The contractor understood that he was to fill in the lower layers of brush up to 2 feet above the level of low water when the brush was weighted down by stone. That is, he was not to make a substructure substantially of stone or of mixed stone and brush, but of brush separated by a layer of stone, and of so much brush that when stone had been added to weight it down the top of the substructure should be 2 feet above low water, as shown in Drawing B. Referring, as he was requested to do, to the other dikes, he found at Evansville 3 cords of brush to 2 cubic yards of stone; at Henderson over 4 cords of brush to 3 yards of stone; or, stated differently, at Evansville 11.40 cords of brush per running foot, at Henderson 6.30 cords of brush per running foot. The contractor believed (and in this the inspector concurred) from these examples that he *417 should put 8.80 cords per running foot into Puppy Creek Dike, which is a fair average between the other two works, as Puppy Creek Dike has not the width and depth of water found at Evansville, but has deeper water than is found at Henderson.
As to the working drawings:
There are two copies in the record, called in the findings A and B, and defendants insist upon the use of A in measuring the contract. If there be any mistake in these drawings it was the fault of defendant’s draftsmen and not of the contractor; and drawing B, which shows a double layer of brush to low-water mark when weighted down by stone, was the one given contractor as his working drawing, and was followed by him and the inspector until the receipt of Major Merrill’s orders to suspend work and to reduce the quantity of brush. The specifications stated (2) that drawings showing the method of building the dikes were on file in the engineer’s office, and were made part of the specifications; also that the contractor would be furnished with a copy thereof, and no departure from them would be permitted without the express sanction of the engineer in charge.
Drawing A appears attached to the contract, but there is no allusion to it in the contract, and it is not shown that it is a correct copy of the drawing on file in Major Merrill’s office. Drawing B, however, was the working drawing actually handed to the contractor as his guide and the Government inspector’s guide in the work, and it was so handed him by defendants after the contract had been signed. It therefore represents the latest views of the engineer in charge of the work, and •should prevail over the earlier alleged copy of the drawings attached to the contract. The original drawings are not in evidence. That the contractor was given drawing B as a correct copy and as his guide seems to us conclusive upon the question as to which drawing should govern. It is, however, interesting to note that even if drawing A be accepted as the true copy of the original on file, still the contention of the defendants as to the amount of brush required would not be sustained, as the substantial difference between the drawings seems to be in the arrangement rather than in the amount of brush.
We conclude that the contemporaneous and practical interpretation given the contract by the contractor and by the Government inspector was correct; the interpretation upon which *418 both acted having before them the same information; that is, the contract, the specifications, the table of approximations, the drawing B, and perhaps the drawing A.
There is in the contract itself this clause authorizing a change in the work under certain conditions:
‘‘If, at any time during the prosecution of the work, it be found advantageous or necessary to make any change or modification in the project, and this change or modification should involve such change in the specifications as to character and quantity, whether of labor or material, as would either increase or diminish the cost of the work, then such change or modification must be agreed upon in writing by the contracting parties, the agreement setting forth fully the reasons for such change, and giving clearly the quantities and prices of both material and labor thus substituted for those named in the original contract, and before taking effect must be approved by the Secretary of War.”
The change or modification therefore to be binding upon either party under the contract must be agreed upon by the contracting parties; the contractor did not agree to it, but protested against it, reserving his rights; the change must be in writing, and the only writings in this matter were Major Merrill’s orders to his inspector; the writing must set forth the reasons for the change or modification and give clearly the quantities and prices of both material and labor substituted for those named in the original contract, and this was not done; finally, the change must be approved by the Secretary of War, and this was not done. There does not appear to have been an effort made to comply with this clause of the contract in relation to brush, as there was not' in relation to the suspension of the work, and for the very good reason that Major Merrill did not think he was changing or modifying the contract as he understood it, and Clark did not agree to any change or modification of the contract as he understood it.
In the specifications there appears this clause :
“ The amount of timber, iron, stone, and brush mentioned in the advertisement is to be held as approximate, and is liable to be increased or diminished as the progress of the work may demand. These amounts will be used in the canvass of bids (s. 42).”
We have already considered the value of the approximate estimates given in the advertisement, and we do not hold that *419 a power to increase or diminish the amount of material gives the Government the right to change the structure or plan of the work, to impair the consideration, or (as in this case) to substantially obliterate it. The changes prescribed by this section of the specifications are such as the work may demand as it progresses; that is, the work prescribed by the contract, not a substantially and structurally different work; and they must be reasonable in amount and such as would be naturally incident to the nature of the work. Such is the only fair interpretation of this clause. It can not be held to authorize the doubling of the quantity of material or the entire omission of one kind of material important to the consideration and the substitution of another material. Section forty-two of the specifications and the already-quoted clause in the contract must be read together, when it will appear that the latter contemplates such slight and immaterial changes as occur in every important enterprise, while the former contemplates any substantial change of plan affecting the cost, the consideration, or the rights of the parties.
So vital a change as the reduction of brush from eight and eight-tenths cords per running foot to two cords per running foot, or even the increase made by Major Merrill of fifty per cent, in the amount of brush over that which he understood to be demaded by the contract, is not a diminution or an increase under s. 42 of the specifications, but is a “ change or modification ” in the contract which should have been agreed to in a writing containing certain statements which we have already considered and which required the approval of the Secretary of War.
In Harvey v. The United States the advertisement referred bidders to the arsenal at Eock Island for detailed information as to the general form and dimensions of the work to be done in constructing a bridge across the Mississippi and for a profile of the river bed; in the contract subsequently signed the plaintiffs were required to build the bridge “ in accordance with such plans and specifications as may be fixed by proper authority acting for the United States.” Plaintiffs alleged damage, in that the size of the piers and abutments prescribed was less than shown in the original plans, so that, while they were required to put into the work an equal amount of dressed stone, which was expensive, they were not allowed to put into it so *420 much of the cheap filling as they had been led to believe would be required, and hence suffered loss, which was allowed (113 U. S. R., 243, also reported 13 C. Cls. R., 322; 17 id., 443, 105 U. S. R., 671; 18 C. Cls. R., 470; and 29 id., 529.)
It has been held by this court as follows:
“ 1. When the contract is for the sale or delivery of a specifically named quantity of goods or articles, and the words “ more or less ” are added with no reference to any other method of determining more exactly the quantity intended or improving the uncertainty created by those words, then the parties will be held to a quantity approximate to that specifically named, allowing only such a slight variation therefrom as, from the circumstances of the case or the nature of the articles to be delivered, may seem to the court to be reasonable.
# # # # * # #
“ 2. When the contract is for the sale or delivery of a specifically named quantity of goods or articles, and the words “ more or less” are added, with a reference to something by which the exact quantity intended can be ascertained and the uncertainty created by those words can be removed, then the words “more or less” will not be restricted to a small quantity, but will limit or extend the quantity expressed to that which may be determined by the reference, and the parties will be held to deliver and accept the latter quantity.” (Brawley v. The United States, 11 C. Cls, R., 532-534.)
This case was affirmed upon appeal, when the Supreme Court, by Mr. Justice Bradley, said:
“ When a contract is made to sell or furnish certain goods identified by reference to independent circumstances, such as an entire lot deposited in a certain warehouse, or all that may be manufactured by the vendor in a certain establishment, or that may be shipped by his agent or correspondent in certain vessels, and the quantity is named with the qualification of “ about,” or “ more or less,” or words of like import, the, contract applies to the specific lot; and the naming of the quantity is not regarded as in the nature of a warranty, but only as an estimate of the probable amount, in reference to which good faith is all that is required of the party making it. In such cases the governing rule is somewhat analogous to that which is applied in the description of lands, where natural boundaries and monuments control courses and distances and estimates of quantity.
“ But when no such independent circumstances are referred to, and the engagement is to furnish goods of a certain quality or character to a certain amount, the quantity specified is ma *421 terial, and governs the contract. The addition of the qualifying words, “about,” “more or less,” and the like, in such cases is only for the purpose of providing against accidental variations arising from slight and unimportant excesses or deficiencies in number, measure, or weight.
“If, however, the qualifying words are supplemented by other stipulations or conditions which give them a broader scope or a more extensive significance, then the contract is to be governed by such added stipulations or conditions. As, if it be agreed to be furnish so many bushels of wheat, more or less, according to what the party receiving it shall require for the use of his mill, then the contract is not governed by the quantity named, nor by that quantity with slight and unimportant variations, but by what the receiving party shall require for the use of his mill; and the variation from the quantity named will depend upon his discretion and requirements so long as he acts in good faith.” (Brawley v. The United States, 96 U. S. R., 171 and 172.)
We therefore hold that the plaintiff is correct in his interpretation of the contrac|i, and also that the defendants were not authorized by the specification (42) to reduce the amount of brush nearly one-half. The approximation fixed in the advertisement was intended, as will be seen from the other clauses in the specifications which we have considered, primarily for use in the canvass of bids, and contractors were in effect warned not to depend upon them, but were referred to the ground and to other dikes as the safe guide.
If we are right in our' interpretation of the contract, then plaintiff should recover for the excluded brush upon the rules laid down by the Supreme Court:
“ The prima facie measure of damages for the breach of a contract is the amount of the loss which the injured party has sustained thereby. If the breach consists in preventing the performance of the contract, without the fault of the other party who is willing to perform it, the loss of the latter will consist of two distinct items or grounds of damage, namely: First, what he has already expended towards performance (less the value of materials on hand); secondly, the profits that he -would realize by performing the whole contract. The second item, profits, can not always be recovered. They may be too remote and speculative in their character, and therefore incapable of that clear and direct proof which the law requires. But when, in the language of Chief Justice Nelson in the case of Masterson v. Mayor of Brooklyn, (7 Hill, 69), they are “ the direct and immediate fruits of the contract,” they are free from this objection; they are then “part and parcel of the contract *422 itself, entering into and constituting a portion of its very elements;. something stipulated for, the right to the enjoyment of which is just as clear and plain as to the fufillinent of any other stipulation.”
“ When a party injured by the stoppage of a contract elects to rescind it, then, it is true, he can not recover any damages for a bfeacli of the contract, either for outlay or for loss of profits; he recovers the value of his services actually performed as upon a quantum meruit. There is then no question of losses or profits. But when he elects to go for damages for the breach of the contract, the first and most obvious damage to be shown is the amount which he has been induced to expend on the faith of the contract, including a fair allowance for his own time and services. If he chooses to go further and claims for the loss of anticipated profits, he may do so, subject to the rules of law as to the character of the profits which may be thus claimed. It does not lie, however, in the mouth of the party who has voluntarily and wrongfully put an end to the contract to say that the party injured has not been damaged at least to the amount of what he has been induced fairly and in good faith to lay out and expend (including his awn services), after making allowance for the value of materials on hand.”
“ It is to be observed that when it is said in some of the books that where one party puts an end to the contract the other party can not sue on the contract, but must sue for the work actually done under it as upon a quantum meruit, this only means that he can not sue the party in fault upon the stipulations contained in the contract, for he himself has been prevented from performing his own part of the contract upon which the stipulations depend. But surely, the willful aud wrongful putting an end to a contract and preventing the other party from carrying it out is itself a breach of the contract, for which an action will lie for the recovery of all damage which the injured party has sustained. The distinction between those claims under a contract which result from a performance of it on the part of the claimant and those claims under it which result from being prevented by the other party from performing it has not always been attended to. The party who voluntarily and wrongfully puts an end to a contract and prevents the other party from performing it is estopped from denying that the injured party has not been damaged to the extent of his actual loss and outlay fairly incurred.” (United States v. Behan, U. S. R., 110, 344-347.)
In Speed’s Case (2 C. Cls. R. 429, affirmed 8 Wall., 77) the plaintiff had incurred a large expenditure in preparing to fulfill his contract, but was unable to carry it out because of defendant’s fault, to his damage, which was thus measured by both courts: “ The difference between the cost of doing the work and what *423 claimants were to receive for it, making reasonable deduction for the less ti me engaged and for release from the care, trouble, risk, and responsibility attending a full execution of the contract” (citing Masterton v. Brooklyn, 7 Hill, 62). In the case of Speed it should be noted the contract was absolutely stopped by defendants; in the case at bar it- was temporarily interrupted and then continued by the substitution of a costly material for a cheap one. The contractor herein was spared no “ care, trouble, risk, or responsibility; ” on the contrary, his risk and care were rather increased by the requirement of stone, which yielded no profit, in the place of brush, which was profitable, and by the increased time required to complete the work.
In Philadelphia, Wilmington and Baltimore Railroad Company v. Howard (13 How. R., 307) the Supreme Court stated the rule of damages thus:
“ But it by no means follows that profits are not to be allowed, understanding, as we must, the term profits in this instruction as meaning the gain which the plaintiff would have made if he had been permitted to complete his contract. Actual damages clearly include the direct and actual loss which the plaintiff sustains propter rem ipsam non haibitam. And in case of a contract like this, the loss is among other things the difference between the cost of doing the work and the price to be paid for it. The difference is the inducement and real consideration which causes the contractor to enter into the contract, * * * and to deprive him of it when the other party had broken the contract and unlawfully put an end to the work would be unjust. There is no rule of law which requires us to inflict this injustice. Wherever profits are spoken of as not a subject of damages, it will be found that something contingent upon future bargains, or speculations, or states of the market are referred to, and not the difference between the agreed price of something contracted for and its ascertainable value, or cost. * * * We hold it to be a clear rule, that the gain or profit of which the contractor was deprived by the refusal of the company to allow him to proceed with and complete the work was a proper subject of damages, (p. 344).”
There is nothing "contingent upon future bargains, or speculations, or states of the market” in the case at bar. Brush grows freely upon the banks of the Ohio, and needs only to be cut and transported to the place where needed and there put in place. The price of the brush, if any, the labor of gathering, loading, and unloading it, and putting it in place, and the price of the transport are the elements of cost. They are not speculative in nature and are easily determined.
*424 We hold, then, that plaintiff is entitled to recover the difference between the cost of obtaining and patting in place the brush required by the contract, as we understand it, and the price agreed upon in the contract, as there was no profit in the substituted stone. This difference the findings show to be $32,479.35.
Upon the whole case, judgment for plaintiff in the sum of $44,990.03.